Brian M. Card (NDBID 07917)
Assistant Attorney General
Office of Attorney General of North Dakota
Consumer Protection & Antitrust Division
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
bmcard@nd.gov

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NORTH DAKOTA

## FARGO DIVISION

* * * * *

| | |
|---|---|
| In re:<br><br>JACK A. GLASSER,<br><br>       Debtor. | Case No: BK-22-30244<br><br>Chapter 7<br><br>**MOTION FOR RELIEF FROM AUTOMATIC STAY UNDER 11 U.S.C. § 362(b)(4)** |

### I. BACKGROUND

[¶1] On May 3, 2022, the State of North Dakota ex rel. Drew H. Wrigley, Attorney General ("State"), pursuant to N.D.C.C. ch. 51-15, commenced a consumer protection enforcement against Debtor Jack A. Glasser ("Debtor"), his business Glasser Images, LLC ("Glasser Images"), his partner Jace Schacher ("Schacher"), and up to 100 John and Jane Does. *See State v. Glasser*, No. 08-2022-CV-00969 (Dist. Ct. S. Central Jud. Dist., N.D.); *also*, Ex. 1.

[¶2] In summary, the State alleges that Debtor and his business violated N.D.C.C. ch. 51-15 by: (1) soliciting large advance payments to take and provide (primarily) wedding photography and videography services and then failed to provide the products, services, or a refund; (2) soliciting large advance payments from clients without disclosing that it was undercapitalized and had been undercapitalized for years before its closure; (3) soliciting large advance payments from clients without disclosing that Debtor and Schacher were spending Glasser

1

Images' funds on themselves; (4) by failing to provide the products and services they advertised and promised; and (5) failing to pay independent contractors for the photography or videography services they performed on behalf of Glasser Images. *Id.*

[¶3]     Pursuant to 11 U.S.C. § 362(b)(4), the State of North Dakota motions the Court seeking an Order recognizing that the automatic stay of 11 U.S.C. § 362 does not operate to stay the State's consumer fraud action against Debtor, pursuant to North Dakota's consumer fraud law, N.D.C.C. ch. 51-15. In the alternative, pursuant to 11 U.S.C. § 362(b)(4), the State seeks an order relieving it from the automatic stay of 11 U.S.C. § 362 so that it can continue to pursue enforcement of its consumer fraud law against Debtor.

## II. POINTS AND AUTHORITIES

[¶4]     The Attorney General's consumer fraud enforcement action is not subject to the automatic stay under 11 U.S.C. § 362.

[¶5]     In pertinent part, 11 U.S.C. § 362(b)(4) provides as follows:

(b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay –

(4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuance of an action or proceeding by a governmental unit …, to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.

11 U.S.C.A. § 362(b)(4).

[¶6]     In *In re First All. Mortg. Co.*, 263 B.R. 99 (B.A.P. 9th Cir. 2001), the Appellate Panel of the Ninth Circuit observed:

The legislative history of [section 362(b)(4)] indicates that when a debtor is sued by a governmental unit in order "to prevent or stop violation of fraud, environmental protection, *consumer protection*, safety, or similar police or regulatory laws, or *attempting to fix damages for violation* of such a law, the action

2

or proceeding is not stayed under the automatic stay." H.R.Rep. No. 595, 95th
Cong., 1st Sess. 343 (1977), *reprinted* in 1978 U.S.C.C.A.N. 5963, 6299; S.Rep.
No. 989, 95th Cong., 2d Sess. 52 (1978), *reprinted* in 1978 U.S.C.C.A.N. 5787,
5838 (emphasis added). By allowing such actions to proceed, this exemption
prevents the bankruptcy court from becoming a "haven for wrongdoers." Berg, 230
F.3d at 1167 (citation omitted).

263 B.R. at 107 (emphasis in original).

[¶7]    Section 362(b)(4) was enacted by Congress to eliminate debate over whether a

governmental unit can exercise its police and regulatory powers to allow "the enforcement of laws

affecting health, welfare, morals, and safety despite the pendency of the bankruptcy proceeding."

*Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1107 (9th Cir. 2005). The United States Supreme Court

has said that, "It is clear from the legislative history that one of the purposes of this exception is to

protect public health and safety." *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474

U.S. 494, 503 (1986) (referring to former Section 362(b)(5) which permitted a governmental unit's

enforcement of nonmonetary judgments).

[¶8]    "[I]t is well-established that consumer protection is a valid exercise of the police

and regulatory power for purposes of § 362(b)(4)." *In re First All. Mortg. Co.*, 263 B.R. 99, 108

(B.A.P. 9th Cir. 2001); *see also*, *State ex rel. Spaeth v. Eddy Furniture Co.*, 386 N.W.2d 901, 903

(N.D. 1986) (recognizing that consumer protection statutes are a manifestation of the State's police

powers). The North Dakota Supreme Court has recognized that the State of North Dakota, pursuant

to its police powers, has the right "to protect the public from fraud and misrepresentations of

dishonest or incompetent persons." *Axtmann v. Chillemi*, 740 N.W.2d 838, 854 (*quoting* 15 Powell

on Real Property § 84C.02 (1)).

[¶9]    As noted *supra*, it is well-established that states' actions pursuant to their consumer

protection laws are not subject to the automatic stay provision of 11 U.S.C. § 362 and there is

substantial legal authority holding the same. *See, e.g.*, *In re First All. Mortg. Co.*, 264 B.R. 634

(holding that governmental units' actions against Chapter 11 bankruptcy debtor for injunctive and monetary relief, including fines, civil penalties, and restitution, fell within the regulatory and police powers exception to the automatic stay); *In re First All. Mortg. Co.*, 263 B.R. 99 (holding that the Bankruptcy Code exempted from the automatic stay the Commonwealth's prosecution to judgment of its consumer fraud claims for civil penalties and attorney fees, and the Commonwealth's restitution claims were also exempt from the automatic stay so long as the Commonwealth sought only the entry, but not the enforcement, of the money judgment.); *In re Steffy*, 494 B.R. 574, 585 (Bankr. N.D. Ga. 2012) ("This Court finds [Arkansas'] arguments persuasive and based on the undisputed facts of the record, it appears that [Arkansas] continued to prosecute its lawsuit to make certain the consumer protection laws of Arkansas were enforced and its citizens protected from Debtor. As such, this purpose is encompassed within the scope of Section 362(b)(4)."); *Halo Wireless, Inc. v. Alenco Commc'ns, Inc.*, 684 F.3d 581, 587-88 (5th Cir. 2012) (citing House Report with approval); *Iams Funeral Home, Inc. v. West Virginia ex rel. McGraw*, 392 B.R. 218, 222 (N.D.W. Va. 2008) (affirming the bankruptcy court's order and memorandum opinion determining that the West Virginia Attorney General's action pursuant to West Virginia's Consumer Credit Protection Act was excepted under 11 U.S.C. § 362(b)(4).); *In re Family Vending, Inc.*, 171 B.R. 907 (Bankr. N.D. Ga. 1994) (holding that Georgia's action against Chapter 7 bankruptcy debtor, alleging violations of Fair Business Practices Act and Sale of Business Opportunities Act, came within the exception to the automatic stay for proceeding by governmental unit to enforce police or regulatory power); *Brock v. Rusco Indus., Inc.*, 842 F.2d 270, 273 (11th Cir. 1988) (citing House Report with approval); *Nicolet, Inc.*, 857 F.2d at 207 (saying that section 362(b)(4) permits a governmental unit to exercise its policing and regulatory powers and "to enforce its laws uniformly without regard to the debtor's position in bankruptcy

court," and that the police and regulatory power exception is essential to prevent "debtors improperly seeking refuge under the stay in an effort to frustrate necessary governmental functions.").

[¶10]   Pursuant to its consumer fraud law, the State may proceed with its action to enforce its consumer fraud law without regard to Debtors' status in bankruptcy. *Matter of Towers*, 162 F.3d 952, 953 (7th Cir. 1998) ("Debts covered by [11 U.S.C. § 523(a)(7)] pass through bankruptcy unaffected; the creditor may disregard the proceedings and enforce its rights later, as Illinois has sought to do."); *In re Charter First Mortg.*, Inc., 42 B.R. 380, 385 (Bankr. D. Or. 1984) ("We believe the clear language of [section 362(b)(4)] means just what it says – that as to those acts listed, the filing of a bankruptcy petition has no stay effect, and the parties purporting to act under any of those subparagraphs may proceed as if none were filed."); *Williams v. State of Wash.*, 554 F.2d 369, 370 (9th Cir. 1977) (saying, after recognizing the doctrines of federalism and comity: "The state is acting to protect its consumers from unfair and deceptive trade practices by prosecuting and penalizing those who violate the Consumer Protection Act. Calling the prosecution 'civil' does not mean that important state policies can be frustrated by federal court interference that would not be countenanced in criminal cases. Because of Washington's governmental interest in enforcing its consumer protection act, federal abstention is required by the *Huffman-Juidice* line of cases.").

[¶11]   Other bankruptcy courts in this district recognize this well-recognized authority: In *In re Hofland*, the District of South Dakota Bankruptcy Court determined that the State's consumer protection enforcement authority, including to investigate and prosecute, was not stayed by the Debtors' bankruptcy petition. Ex. 2.

5

### III. PRAYER FOR RELIEF

[¶12]   In light of this well-established law, the State respectfully requests that, pursuant to

11 U.S.C. § 362(b)(4), this Court recognize and order:

 a. That Debtor's Petition does not, pursuant to 11 U.S.C. § 362(b)(4), operate as a stay

  of the State of North Dakota's consumer protection action against Debtor and the

  State may seek and obtain all relief provided by N.D.C.C. ch. 51-15, including:

  injunctive relief, consumer restitution, costs, and civil penalties, even if collection

  efforts may be subject to the automatic stay or discharge injunction.

 b. Such other relief as the Court may determine to be fair, just, and equitable.

Dated this 17th day of August, 2022.

    **STATE OF NORTH DAKOTA**
    Drew H. Wrigley
    Attorney General


   By: /s/ Brian M. Card
     Brian M Card
     ND State ID No. 07917
     Assistant Attorney General
     Consumer Protection & Antitrust Division
     Office of Attorney General
     1720 Burlington Drive, Suite C
     Bismarck, ND  58504-7736
     Telephone (701) 328-5570
     Facsimile (701) 328-5568
     bmcard@nd.gov

# EXHIBIT 1

STATE OF NORTH DAKOTA                                      IN DISTRICT COURT

COUNTY OF BURLEIGH                           SOUTH CENTRAL JUDICIAL DISTRICT

| | |
|---|---|
| STATE OF NORTH DAKOTA EX REL. DREW H. WRIGLEY, ATTORNEY GENERAL,<br><br>Plaintiff,<br><br>-vs-<br><br>GLASSER IMAGES, LLC, JACK GLASSER, JACE SCHACHER, and JOHN AND JANE DOE 1 – 100,<br><br>Defendants. | Civil No. ____08-2022-CV-00969____<br><br><br><br><br><br>**COMPLAINT**<br><br><br><br>CPAT 200143.003 |

[¶1] Plaintiff State of North Dakota on the relation of Drew H. Wrigley Attorney General, by and through Assistant Attorneys General Brian M. Card and Parrell D. Grossman, Consumer Protection and Antitrust Division, brings this cause against Defendants Jack Glasser, Jace Schacher, and Glasser Images, LLC, and upon information and belief alleges as follows:

## I. INTRODUCTION

[¶2] The State of North Dakota brings this equitable action on the relation of Drew H. Wrigley, the Attorney General of the State of North Dakota, in the public interest pursuant to North Dakota Century Code (N.D.C.C.) ch. 51-15. This action seeks equitable relief, under N.D.C.C. § 51-15-07, to restrain and enjoin violations of N.D.C.C. ch. 51-15, specific performance, and to recover property loss suffered by consumers as a result of such violations. This action also seeks, under N.D.C.C. § 51-15-10, to recover costs, expenses, and attorney's fees incurred by the Attorney General in the investigation and prosecution of this action and, under N.D.C.C. § 51-15-11, to obtain civil penalties of not more than $5,000.00 for each

violation of N.D.C.C. §§ 51-15-02 and 51-15-02.3.

## II. JURISDICTION AND VENUE

[¶3] Under N.D.C.C. §§ 51-15-07, 51-15-10 and 51-15-11 the district court has jurisdiction to enter appropriate orders.

[¶4] Venue in Burleigh County is proper under N.D.C.C. §§ 28-04-03 and 28-04-05 because Defendants have or had a principal place of business in Burleigh County, Defendants transacted business in Burleigh County, and all or part of the cause of action arose in Burleigh County.

[¶5] This Court has personal jurisdiction over Defendants. Defendants, either acting directly or by an agent, did one or more of the following: transacted business in North Dakota; contracted to supply, or supplied, services, goods or other things in North Dakota; committed a tort within or outside North Dakota causing injury to another person or property within North Dakota; committed a tort within North Dakota causing an injury to another person or property within or outside North Dakota; engaged in any other activity within North Dakota; or violated North Dakota law.

## III. DEFENDANTS

[¶6] Glasser Images, LLC ("Glasser Images") is a North Dakota limited liability company with a former principal address of 510 Main Ave., Ste. 3A, Bismarck, ND 58501-4411. Glasser Images was registered as a limited liability company on March 25, 2008. Id. Glasser Images' registered agent is Jack Glasser, PO Box 3190, Bismarck, ND 58502-3190.

[¶7] Defendant Jack Glasser ("Jack") is an adult individual and upon information and belief is or was residing at 817 14th St. SE, Mandan, ND 58554. Jack owned and operated Glasser Images.

[¶8] Defendant Jace Schacher ("Jace") is an adult individual and upon information and belief is or was residing at 817 14th St. SE, Mandan, ND 58554. Jace is or was Glasser's partner and is or was an employee of Glasser Images.

[¶9] Defendants John and Jane Doe 1 – 100 ("Does 1 – 100") are adult individuals and upon information and belief are domiciled in North Dakota and elsewhere who contracted with Glasser Images to perform services on Glasser Images' behalf in North Dakota and elsewhere.

[¶10] Defendants, individually or in concert with others, formulated, directed, controlled, or participated in the acts and practices set forth herein.

## IV. NATURE OF DEFENDANTS' BUSINESS

[¶11] Defendants, at all relevant times hereto, were engaged in the sale[1] or advertisement of merchandise to persons in the State of North Dakota. Specifically, Defendants are or were engaged in the sale or advertisement of photography and videography services, and contracted to provide edited photographs and videos to persons in North Dakota.

## V. FACTUAL ALLEGATIONS

**A.    Count 1: After soliciting advance payments from consumers, Glasser Images failed to provide products or services. (Against Jack Glasser and Glasser Images.)**

[¶12] In connection with the sale or advertisement of merchandise to persons in North Dakota, Defendants Jack and Glasser Images acted, used, or employed deceptive acts or practices, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon, whether or not any person has in fact been misled, deceived, or damaged thereby, including by failing, refusing, or having an inability to provide services for which Glasser Images received monetary consideration, in violation of N.D.C.C. § 51-15-02.

---

[1] The terms "sale," "advertisement," "merchandise," and "person" are used in this Complaint as defined in N.D.C.C. § 51-15-01.

[¶13] In the alternative, Jack and Glasser Images provided assistance or support to the other while the other engaged in the acts or practices alleged in Count 1, in violation of N.D.C.C. ch. 51-15, when they knew or consciously avoided knowing the other was engaged in an act or practice in violation of N.D.C.C. ch. 51-15, in violation of N.D.C.C. § 51-15-02.3.

[¶14] Glasser Images was a photography business based in Bismarck that operated for approximately sixteen years.

[¶15] According to filings with the Secretary of State, Glasser Images was formed as a limited liability company on March 25, 2008, and Jack Glasser is and was the business's sole member.

[¶16] Intending reliance, Glasser Images advertised its services to consumers on its website, formerly located at glasserimages.com; on social media, including on Facebook and Twitter; and on other websites, including at weddingwire.com and theknot.com.

[¶17] On its website, Glasser Images described itself as a "professional photographer[ ] and videographer[ ] providing wedding photography, wedding video, commercial photography, commercial video, senior pictures, family portraits, newborn photography, and business headshots."

[¶18] Intending reliance, Glasser Images entered into contracts with clients.

[¶19] Glasser Images' contracts with its clients contained the same basic terms: In exchange for monetary consideration, Glasser Images promised to provide photography and videography services and edited photographs and videos.

[¶20] Glasser Images' contracts required that clients rely solely on them and prohibited clients from retaining other photography or videography services.

[¶21] For example, on March 7, 2020, Glasser Images entered into a contract with a client. Generally, Ex. 1 (NDAG 1 – NDAG 6). For a total contract price of $4,078.70, Glasser

4

Images promised to provide on June 26, 2020: (1) wedding photography by two photographers for 10 hours; and (2) wedding videography by one videographer for 6 hours. Id. at p. 2 (NDAG 1).

[¶22] In addition to photography and videography services, Glasser Images promised it would provide edited photographs that were "individually edited for color correction, contrast adjustments, tonal adjustments, color enhancements, and conversion." Id. at p. 5 (NDAG 4).

[¶23] Glasser Images required clients to pay a "non-refundable retainer on the date and equal to the amount" specified on the contract. Id. at p. 3 (NDAG 2). In the case of the contract shown in Exhibit 1, Glasser Images required the client to pay a non-refundable retainer of $4,078.70 on February 26, 2020. Id. at p. 2 (NDAG 1).

[¶24] Glasser Images forced the client to rely solely upon it by prohibiting the client from retaining the services of another photographer. Id. at p. 3 (NDAG 2). Glasser Images required the client to agree that it "shall be the exclusive photographer retained by Client for the purpose of photographing the wedding day," and "it is understood that [Glasser Images] is the exclusive official photographer retained to perform services outlined in [the] contract." Id.

[¶25] In another example, Glasser Images contracted to provide 10 hours of both photography and videography services to a client on November 13, 2021, for a total contract price of $3,910.00. Ex. 2 at p. 6 (NDAG 18). The contract contained the same basic terms and conditions as the contract summarized above. Id. at pp. 6 – 7, 12 (NDAG 18 – NDAG 19, NDAG 24).

[¶26] The contracts shown in Exhibits 1 and 2 were typical of Glasser Images' contracts with clients.

[¶27] In 2019, 2020, and 2021, Glasser Images contracted with hundreds of clients to provide services of the type described in Paragraphs 21 – 25, *supra*, and solicited and accepted

advance payments ("retainers") from hundreds of clients for weddings that would take place on a future date.

[¶28] Consumer advance payments to Glasser Images took different forms, including a retainer that was a percentage of the total contract amount, the full contract amount, or a down payment followed by monthly payments.

[¶29] Despite receiving advance payments from hundreds of clients, on October 7, 2021, Jack announced the abrupt closure of Glasser Images.

[¶30] In a statement, Jack said:

> We've been in business for 16 years and up until Covid-19 hit, we were successful and growing, but then things drastically changed for the worse. We pivoted and made changes, but simply couldn't keep up with our ongoing costs, debt repayment, salaries, rent and other business expenses. These factors have caused irreparable damage to the business and has forced us to make this decision rapidly. Closing our doors is extremely heart wrenching for me.

Ex. 3 at p. 2 (NDAG 7).

[¶31] Glasser Images' abrupt closure resulted in an immediate outcry from hundreds of clients who made advance payments to it relying on its promise to provide services. Id. at p. 3 (NDAG 8)

[¶32] One client's wedding was scheduled for October 9, 2020, "but the day before he was left scrambling to find a solution after Glasser Images decided to close its doors just 48 hours before his wedding." Id.

[¶33] Another client paid Glasser Images $4,000 in advance for photography and videography services for a wedding the following September, but because of Glasser Images' abrupt closure, said she might have to forgo a planned honeymoon. Id.

[¶34] Other clients were similarly blindsided by Glasser Images abrupt closure: "Paid in full (9/29/20) over a year ago for wedding pictures and video. Got Email notice the night before

our wedding (10/08/21) that the company was closing and not honoring any prior agreements and that there would be no refunds." Ex. 4 at p. 3. (NDAG 38).

[¶35] In an e-mail sent on October 9, 2021, a client described her devastation with Glasser Images' abrupt closure:

> Wow, just wow. I can't think. I can't sleep. I may not ever see my wedding photos... photos my husband's 95-yr-old grandpa was in, photos my aging and not well Grandpa was in, photos my nieces and nephew were all in, photos of exchanging our vows, photos of us spending our day with loved ones many of which we hadn't seen for at least a year or more due to COVID. I'm devastated. I feel so incredibly betrayed. We cannot redo that day.

Ex. 5 at p. 2 (GI 1240951).

[¶36] Following Glasser Images' abrupt closure, the Consumer Protection Division of the Attorney General's Office has received 540 complaints against Jack and his business.

[¶37] Despite knowing before the evening of October 7, 2021 that Glasser Images would close, Glasser Images solicited advance payments from clients earlier that same day.

[¶38] Consumers' outcry was justified because Glasser Images actively concealed both the business's poor financial condition and the *claimed* impact of COVID-19 on the business. For example, on October 1, 2020, a consumer contacted Jace and shared her concern about the impact of the pandemic on the business:

> Do you have something built into your contract regarding Covid (crossing my fingers this is not a thing in 2021, of course)? (This would mostly make me a bit uneasy if we were to pay all upfront to receive the 10% discount and then risking losing all that money).

Ex. 6 at p. 3 (GI 754911).

[¶39] Despite being directly asked, Jace not only concealed Glasser Images' poor financial condition and the claimed impact of the pandemic but solicited payment from the consumer:

> Let me first say that we have been in business for 15 years and we are not going

anywhere, so no worries on that portion.

...

If you aren't sure, then maybe choosing a different down payment is a better option.

Id. at p. 2 (GI 754910).

[¶40] As a result of Glasser Images' business practices and abrupt closure, hundreds of consumers were impacted in at least four different ways:

    a.  Some clients paid advance payments to Glasser Images and received nothing, including a refund.[2]

    b.  Some clients paid advance payments to Glasser Images, had their wedding photographed and video recorded, but have not received their photographs or video recording, whether edited or unedited.

    c.  Some clients paid advance payments to Glasser Images, had their wedding photographed and video recorded, but only received unedited photographs or video recording, and not the promised edited photographs or video recording.

    d.  Some clients paid advance payments to Glasser Images and obtained their photographs or video recording (edited or unedited) only after paying their photographer or videographer (who Glasser Images did not pay) directly, effectively paying twice.

[¶41] In summary, Glasser Images solicited monetary consideration from consumers promising merchandise in exchange, but then failed to provide the promised merchandise in violation of N.D.C.C. § 51-15-02.

---

[2] An unknown subset of clients filed disputes with their credit card companies and may have received back some or all of the amounts paid to Glasser Images from a third-party credit card processor. Jack and Glasser Images may therefore contend they do not owe restitution, but they do. Jack and Glasser Images are not entitled to force a third-party credit card processor to pay consumer restitution on their behalf for amounts paid to Glasser Images.

**B.      Count 2: Glasser Images solicited advance payments from consumers without disclosing it was undercapitalized and/or financially unstable and could fail at any time. (Against Jack Glasser and Glasser Images.)**

[¶42] The allegations made in all prior paragraphs are incorporated by reference as if fully set forth herein.

[¶43] In connection with the sale or advertisement of merchandise to persons in North Dakota, Defendants Jack and Glasser Images acted, used, or employed deceptive acts or practices, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon, whether or not any person has in fact been misled, deceived, or damaged thereby, including by failing to disclose that Glasser Images was undercapitalized[3] prior to soliciting monetary consideration, in violation of N.D.C.C. § 51-15-02.

[¶44] In the alternative, Jack and Glasser Images provided assistance or support to the other while the other engaged in the acts or practices alleged in Count 2, in violation of N.D.C.C. ch. 51-15, when they knew or consciously avoided knowing the other was engaged in an act or practice in violation of N.D.C.C. ch. 51-15, in violation of N.D.C.C. § 51-15-02.3.

[¶45] As noted above, Jack's narrative is that Glasser Images closed abruptly on October 7, 2021 due to the impact of the COVID-19 pandemic on the business. Supra, ¶ 30. This is nothing more than a ready-made excuse employed by Jack and Glasser Images intended to garner sympathy from the public, and they will no doubt employ it to the Court in an attempt to deflect responsibility for concealing Glasser Images' poor financial condition from clients when it solicited advance payments.

[¶46] But no one should be fooled. Glasser Images' failure was the inevitable result of Jack's mismanagement and personal financial exploitation of the business. Infra ¶¶ 54 – 222. Jack's conduct was exacerbated by Jace who personally benefited from his and Jack's conduct.

---

[3] Insufficient capital to conduct normal business operations and pay creditors.

Infra ¶¶ 157 – 222.

[¶47] For these reasons, Glasser Images' failure was completely foreseeable and was not due to the pandemic.

[¶48] Significantly, whether the business failed due to Jack's mismanagement of his business or the pandemic, consumers were none the wiser.

[¶49] **No matter the reason for Glasser Images' failure**, the business should have disclosed to its clients, potential clients, and independent contractors that it might not be able to keep its promises to them due to both its financial condition and exploitation by Jack and Jace. Glasser Images' failure to do so constitutes consumer fraud.

[¶50] Instead, as is detailed below, Glasser Images concealed the business's financial condition from everyone to the detriment of the business's hundreds of clients. Only Jack and Jace knew Glasser Images' true financial condition.

[¶51] According to Jack and Glasser Images, "up until Covid-19 hit, we were successful and growing, but then things drastically changed for the worse," *Supra* ¶ 30, but this is not true. Glasser Images was not "successful and growing" before the COVID-19 pandemic, and the COVID-19 pandemic did not cause "things to drastically change[ ] for the worse."

[¶52] In reality, the opposite is true. Due to its undercapitalization, Glasser Images had a poor financial condition for years before its closure. As a result of its poor financial condition, Glasser Images' bank accounts were regularly overdrawn, and Jack constantly sought funding from others, including the banks where his accounts were held.

[¶53] The COVID-19 pandemic actually *helped* Glasser Images continue to operate past the point it otherwise might have. Without the pandemic, Jack would not have been able to apply for and receive government money to offset his mismanagement of Glasser Images.

***For years before its closure, Glasser Images endured a poor financial condition.***

[¶54] Contrary to Jack's pandemic narrative, Glasser Images' poor financial condition existed at least as far back as 2017 and continued until its closure.

[¶55] On or about August 25, 2017, Glasser Images received $350,000 from the Small Business Administration's Express Program, approximately the same amount ($330,000) as a reduction in Glasser Images' total assets for the year 2017.

[¶56] Jack told First Western Bank & Trust ("First Western") that the reduction in assets was attributable to "adjustments made by [Glasser Images'] accountant relating to items done personally prior to incorporation."

[¶57] In other words, Jack and Jace spent $330,000 of the business's money on themselves, and Glasser Images' accountant adjusted its balance sheet to reflect it.

[¶58] Despite having received $350,000 from the Small Business Administration's Express Program in 2017, Jack needed funding from other sources for the business in 2018.

[¶59] In or around November of 2018, Jack applied for a $500,000 loan on Glasser Images' behalf from First Western having represented that an investor was going to make a significant investment in the business.

[¶60] Contrary to his representation to First Western, Jack did not secure an investment for the business.

[¶61] When Jack applied for $500,000 from First Western, he had already: (1) taken out a PayPal loan for a $100,000; (2) owed $6,566.55 to First Community Credit Union on a $310,000 loan; (3) owed $12,600 to J.G.-1; (4) owed $14,600 to J.G.-2; and (4) had past due accounts. Ex. 7 at pp. 2 – 4 (FWBT 693 – 695).

[¶62] In addition to the $500,000 loan, Jack also wanted assistance obtaining funding from the Bank of North Dakota for Glasser Images. Id. at p. 2 (FWBT 693).

[¶63] After obtaining the $500,000 for Glasser Images, on or about December 27, 2018, Jack applied for and received a $35,000 personal loan, all or a portion of which he gave to Glasser Images.

[¶64] In summary, in or before 2018, Jack obtained loans of, or already owed, at least the following amounts for Glasser Images:

| Source | Amount |
|---|---|
| SBA Express Program | $350,000 loan |
| PayPal | $100,000 loan |
| First Community Credit Union | $310,000 loan |
| J.G.-1 | $12,600 loan |
| J.G.-2 | $14,600 loan |
| First Western Bank | $500,000 business loan |
| First Western Bank | $35,000 personal loan |

[¶65] On its 2018 income tax returns, Glasser Images reported a $195,882 loss.

[¶66] But the funding Jack obtained for Glasser Images before 2019 was not enough and Jack continued to seek funding.

[¶67] On January 3, 2019, Jack requested additional credit from First Western while acknowledging that his past efforts have failed "to get [Glasser Images] out of this hole," and that he is "constantly playing catchup." Ex. 8 at p. 3 (FWBT 590). Jack proposed several possible routes to inject money into the business. Id. at pp. 3 – 4 (FWBT 590 – 591).

[¶68] In a January 4, 2019 e-mail, First Western advised Jack against taking on additional debt, particularly debt with high interest, saying, "if we just keep throwing debt at this you may not get your head above water in regards to cash flow." Id. at p. 2 (FWBT 589).

[¶69] On January 9, 2019, Jack requested a $250,000 line of credit from First Western and indicated his need for the funding was urgent. Ex. 9 at p. 8 (FWBT 652).

[¶70] On January 10, 2019, Jack told First Western that Glasser Images' checking account "dip[ped] negative today," and that Glasser Images was "just squeezing by but barely." Id. at p. 7 (FWBT 651).

[¶71] On January 10, 2019, as the conversation continued, Jack disclosed to First Western that Glasser Images' "[a]ctual bank balance today is -$4500 due to some of last [sic] payroll's checks still clearing. If all cleared, we'd now be at -$10k." Id. at p. 5 (FWBT 649).

[¶72] On January 11, 2019, Bravera Bank[4] advised Jack that the Glasser Images checking account had been overdrawn for four days and, if the account was not credited sufficiently, the bank would begin refusing payment. Ex. 10 at p. 2 (Bravera 1296). Jack was further advised that the bank had paid "39 items since the 4th quarter of 2018 through [January 11, 2019]. That is becoming too frequent." Id.

[¶73] On or about January 14, 2019, Jack received an additional $65,140.00 from First Western, all or a portion of which he gave to Glasser Images.

[¶74] On or about January 28, 2019, Jack obtained another $300,000 loan from First Western Bank for Glasser Images.

[¶75] On or about May 2, 2019, Jack obtained another $100,000 loan from First Western Bank for Glasser Images.

[¶76] Despite the funds he received from First Western, on June 6, 2019, Bravera told Jack that Glasser Images' account "has been essentially negative for a week and $21k is far too large of an amount for [the bank] to carry. The items in question hit the account yesterday so they have to be returned this morning." Ex. 11 at p. 4 (Bravera 1364).

---

[4] American Bank Center changed its name to Bravera on June 9, 2021.

13

[¶77] On or about that same date, Jack obtained another $200,000 loan from First Western Bank for Glasser Images.

[¶78] On or about September 30, 2019, Jack was approved for $150,000 from the North Dakota Development Fund and received the funds sometime thereafter.

[¶79] In summary, throughout 2019, Jack obtained at least the following loans for Glasser Images:

| Source | Amount |
|---|---|
| First Western | $65,140 personal loan |
| First Western | $300,000 business loan |
| First Western | $100,000 personal loan |
| First Western | $200,000 personal loan |
| North Dakota Development Fund | $150,000 business loan |

[¶80] On or about December 12, 2019, Jack requested from First Western an extension of the maturity date of his personal loans and Glasser Images' business loans to March of 2020.

[¶81] First Western Bank's assessment of Jack concluded he had a "substandard" loan grade, meaning that there was the "distinct possibility the bank will sustain some loss if ... deficiencies are not corrected." The bank's SWOT[5] analysis concluded the performance of Glasser Images itself was a weakness.

[¶82] First Western's assessment of Glasser Images concluded the business also had a "substandard" loan grade. The SWOT analysis concluded the business's weaknesses were its collateral and equity positions.

[¶83] On its 2019 income tax returns, Glasser Images reported a $680,890 loss.

---

[5] Strengths Weaknesses Opportunities Threats

[¶84] The funding Jack obtained for Glasser Images in 2019 was still not enough, and Jack continued to seek and obtain funding for Glasser Images throughout 2020.

[¶85] On January 29, 2020, Jack entered Glasser Images into an agreement with Fora Financial Advance to receive $150,000 in exchange for 10.3% of Glasser Images' future sales proceeds until Glasser Images paid $214,500. Ex. 12 at p. 2 (FWBT 673).

[¶86] In addition to the earlier PayPal loan, Jack obtained another $125,000 loan from PayPal's LoanBuilder for Glasser Images. Ex. 13 at p. 2 (FWBT 658).

[¶87] On March 16, 2020, First Western processed another request by Jack for an extension of the maturity dates of his personal loans and Glasser Images' business loans.

[¶88] Almost immediately after the first mitigating action was taken against the COVID-19 pandemic in North Dakota, Jack used it as an excuse to seek funding from his banks.

[¶89] On March 17, 2020, Jack contacted First Western and requested assistance due to the pandemic while acknowledging that Glasser Images was not "in a good cash position to begin with." Ex. 14 (FWBT 544).

[¶90] Fearing that Glasser Images would run out of cash by the end of the week and not make payroll, he requested that First Western fast track a consolidation loan application and provide additional funds. Id.

[¶91] On March 18, 2020, Jack contacted First Western again and elaborated on his need to consolidate his loans so that he could, among other things, (1) pay vendors, many of whom were over 90 days past due; and (2) pay off short-term loans taken before the pandemic. Ex. 15 at p. 4 (FWBT 619). He also acknowledged that, with First Western's help, Glasser Images will be "where we need to be as we discussed prior to the COVID-19 crisis." Id.

[¶92] A day later, on March 19, 2020, Jack outlined the Glasser Images' poor financial condition:

We will not be able to make it for 60 days, let alone into next week. I need working capital ASAP. If not, I will need to shut down our apps needed for operations (our booking system for scheduling and invoicing, editing software, album design app, file storage, and so much more that require monthly payments), I will not be able to pay rent or equipment leases, we will need to stop advertising (which will cease the inquiries we have been getting), I will not be able to make payroll, we will not have people to fulfill weddings this summer, etc etc etc. SBA will take too long. Why can't we consolidate now? We have been talking about this for months. And now, more than ever, we need to consolidate and get additional capital to move forward. This is dire. I am not sure what I will do.

Id. at p. 2 (FWBT 617).

[¶93] A few days later, on March 23, 2020, Jack requested a bridge loan from First Western Bank "again." Ex. 16 (FWBT 545).

[¶94] In a March 23, 2020 e-mail, at a time when Glasser Images' account "dropped negative," Jack requested assistance from Bravera claiming that Glasser Images had "felt the effect" of the pandemic which was "compounded with past cash flow needs." Ex. 17 at p. 5 (Bravera 1387).

[¶95] Despite Jack's invocation of the pandemic, Bravera denied Jack's request for additional funding due to Glasser Images' past financial condition, saying, "I think from our perspective, we certainly need to know that there has been improvements in profitability and cash for us to consider looking at things again." Id. at p. 2 (Bravera 1387).

[¶96] A day after Jack's communications with Bravera, on March 24, 2020, Jack e-mailed his employees to tell them that he was delaying their paychecks. Ex. 18 at p. 2 (HK 19586).

[¶97] Despite his regular invocation of the COVID-19 pandemic as an excuse for Glasser Images' financial condition and business failure, Jack's communications with his bankers, nonetheless, repeatedly acknowledge the business's poor financial condition existed before it. Supra ¶¶ 89 – 95.

[¶98] Critically, Glasser Images, relying on the language of its contracts, **refused to provide refunds** to clients whose weddings were legitimately impacted by the pandemic. <u>Generally</u>, Ex. 19 (NDAG 11 – NDAG 13) (Jack acknowledges it "may seem ruthless ..." not to provide a refund).

[¶99] In a display of hypocrisy and entitlement, Jack and Glasser Images believed the government and their banks should give *them* money due to the pandemic while they simultaneously refused to provide a refund to clients who requested one. <u>Supra</u> ¶ 98; <u>infra</u> ¶¶ 102,105,134.

### *Even after receiving COVID-19 relief funds, Glasser Images continued to have a poor financial condition that it did not disclose to its clients even as it solicited advance payments.*

[¶100] In an e-mail dated April 2, 2020, Jack told Bravera that both his business and personal accounts were negative. Ex. 20 at p. 3 (Bravera 1415). Jack outlined his extensive efforts to obtain funding from various sources, including "2 banks on bridge loans, working capital, and the SBA PPP." <u>Id.</u>

[¶101] Jack specifically stated that he had applied for the SBA Disaster Loan while simultaneously acknowledging that the business's financial problems existed before the pandemic and for unrelated reasons: "As you know, we had cash flow issues before due to our growth and business model." <u>Id.</u>

[¶102] On April 3, 2020, Glasser Images was approved for, and later received, a $245,000 loan through the Paycheck Protection Program ("PPP").

[¶103] In an e-mail dated April 28, 2020, Jack contacted First Western regarding the Bank of North Dakota's COVID-19 PACE Recovery Program and his claimed need for the funds due to the COVID-19 pandemic. Ex. 21 at p. 6 (FWBT 610).

[¶104] In response, First Western advised Jack that the program was not available to

Glasser Images because the business's problems existed before the pandemic: "I would agree that this could work but there is one big issue. The business was not spinning off enough cash to make its debt payments prior to this event. [Bank of North Dakota] requires that for this program." Id. at p. 5 (FWBT 609). Later in the conversation, First Western told Jack that "[a]dding additional debt, regardless of the terms is not going to help the business cash flow as it is a struggle at best currently." Id. at p. 2 (FWBT 606).

[¶105] On or about May 15, 2020, Glasser Images was approved for, and later received, $150,000 through the Small Business Administration's COVID-19 Economic Injury Disaster Loan ("EIDL") program.

[¶106] In a document prepared by Jack for First Western Bank, he admits that, as of May 21, 2020, the pandemic had not caused any actual financial impact on Glasser Images. Ex. 22 (FWBT 308).

[¶107] According to Jack: "**In total, [estimated lost business] has resulted in a $244,031 to $369,221 impact. This has been offset by $395,000 from the SBA PPP and SBA EIDL Programs.**" Id. (emphasis in original); supra ¶¶ 102, 105.

[¶108] But just days later, on May 24, 2020, Jack sent an e-mail to employees telling them he was delaying payroll. Ex. 18 at p. 2 (HK 19586).

[¶109] On August 5, 2020, Jack made another request for credit from Bravera. Ex. 23 at p. 3 (Bravera 1696). He acknowledged that the business was "still running a loss," but that it was doing better than 2019, a time predating the pandemic. Id.

[¶110] In response, Bravera declined Jack's request noting that while Glasser Images had shown improvement in 2020 compared to 2019, it was still insufficient to warrant an extension of credit: "I am not sure how 2019 finished for you but through July, that was a pretty significant loss. Although 2020 has shown improvement, those numbers wouldn't justify us issuing

additional debt in the form of credit cards." Id. at p. 2 (Bravera 1695).

[¶111] The bank further noted that the business had always generated good revenue, but it has "some work to do to control expenses ..." Id.

[¶112] As will be shown below, the business's uncontrolled expenses included personal expenditures made by Jack and Jace, personal expenditures they continued to make even while Jack sought loans from the government, banks, family, and friends. Infra ¶¶ 157 – 222.

[¶113] Six months after Jack pleaded for the consolidation loan from First Western, on September 2, 2020, during Glasser Images' "peak season," he once again requested additional credit from First Western for the business: "I know you are taking the [$1.2 million] consolidation of just the First Western loans to the committee. But that will not do us any good. That will not be enough. We need the [$1.6 million]. The credit cards and PayPal are sucking all of the cash out of the business." Ex. 24 at p. 3 (FWBT 621).

[¶114] Jack continued by asking: "What's $400,000 when we already have [$1.2 million]," and stating: "Without it, we cannot survive." Id.

[¶115] Aware of its precarious financial position, Glasser Images continued to take advance payments from clients for another year knowing it likely would not be able to provide the merchandise it promised. Furthermore, Jack and Glasser Images did nothing to protect or secure the advance payments entrusted to the business in the event that refunds were necessary in the future.

[¶116] Jack's insistent request for an additional $400,000 for Glasser Images was not solely for the sake of the business despite his representation to First Western. In fact, he wanted to use at least $150,000 as a down payment to purchase $750,000 of land for personal use. Ex. 25 (GI 599927 – 599928); Ex. 26 at p. 2 (GI 599904) (saying, "Yes, the land would be for personal use BUT it would be paid for with business cash flow – our salaries couldn't support the

payments."); <u>infra</u> ¶¶ 198 – 201.

[¶117] On September 4, 2020, during continued requests for credit from First Western, Jack grew frustrated with the bank's denial of additional credit: "Does the bank not understand that we will not cash flow without additional cash? We will run out of cash. We will not be able to operate." Ex. 27 at p. 3 (FWBT 627).

[¶118] In response, the bank advised Jack that Glasser Images "should not need loan funds to cash flow," and that Glasser Images spent $500,000 in payroll and advertising to generate $200,000 additional revenue in 2019. <u>Id.</u> at p. 2 (FWBT 626).

[¶119] First Western's annual review of Glasser Images concluded the business "has not shown the ability to cash flow or service debt with negative net incomes reported on year end statements since 2017," and that the business has struggled since it began its relationship with First Western in 2018.

[¶120] On September 10, 2020, First Western wrote that Glasser Images was doing well despite the pandemic (contrary to Jack's narrative):

> The business appears to be doing well despite the apparent issues COVID-19 have had upon the public. The business has had to move back some wedding shoots from Spring to Summer of 2020 but have had minimal cancellations. The effects of the virus have actually seen an improvement in revenues compared to the same time period in previous years for the business as wedding shoot customers have purchased additional add-ons to their packages as they want to preserve their wedding photos.

[¶121] On September 15, 2020, Jack again requested credit from First Western acknowledging that Glasser Images was "just skirting by and barely keeping the checking account positive." Ex. 28 at p. 2 (FWBT 564). Jack asked First Western if it had "an immediate solution for [Glasser Images'] cash position," which he described as "not good." <u>Id.</u>

[¶122] On September 25, 2020, First Western questioned Jack's contradictory representations that Glasser Images had been severely impacted by the pandemic but that the

business's revenue was up every month compared to the prior year: "How is the revenue up every month when comparing this year with last year considering the effects that you say the pandemic has caused." Ex. 29 at p. 2 (FWBT 566).

[¶123] In response, Jack acknowledged two things: first, the business was not impacted by the COVID-19 pandemic to the extent that Jack would have everyone believe; and second, the business was suffering financially before 2020: "Weddings are up and carrying the increase but commercial isn't, hence the continued losses and cash flow issues. Remember how much of a loss we had last year [2019]. I can send reports again, if needed to help illustrate that." Id.

[¶124] On September 29, 2020, Jack executed a promissory note for a consolidation loan of approximately $1.2 million dollars from First Western and personally guaranteed it.

[¶125] As with his prior loans for the business, Jack obtained the consolidation loan from First Western for Glasser Images because a friend of his agreed to personally guarantee the loans. Neither Jack nor Glasser Images would have qualified for the First Western loans on their own.

[¶126] Additionally, Jack obtained loans for Glasser Images from various individuals throughout 2020 that totaled approximately $178,500.

[¶127] In summary, throughout 2020, Jack obtained at least the following loans for Glasser Images:

| Source | Amount |
|---|---|
| Fora Financial | $150,000 business loan |
| PayPal LoanBuilder | $125,000 business loan |
| Small Business Administration Paycheck Protection Program | $245,000 business loan. (Forgiven.) |
| Small Business Administration | $150,000 business loan. (Forgiven.) |

21

| Source | Amount |
|---|---|
| Economic Injury Disaster Loan | |
| First Western Bank | $1.2 million consolidation loan |
| J.G.-1 | $8,000 personal loan |
| J.G.-2 | $61,513.05 personal loan |
| J.G.-2 | $9,078 personal loan |
| S.R. | $50,000 personal loan |
| D.B. | $50,000 personal loan |

[¶128] On November 9, 2020, a year before Jack closed Glasser Images, Jack's accountant told him that the business had too much debt and not enough cash flow, and, as a result, neither banks nor investors would assist him because he could not pay them back. Ex. 30 at p. 2 (HK 151). Jack's accountant suggested that Jack should consult with a bankruptcy attorney. Id. at pp. 2 – 3 (HK 151 – 152).

[¶129] But Jack did not heed his accountant's advice. Instead, Glasser Images continued to solicit advance payments from clients and potential clients without disclosing its poor financial condition.

[¶130] Just days after Jack was advised he should consult with a bankruptcy attorney, on or about November 12, 2020, Jack and Jace received $34,132.00 into their personal account, the proceeds of a loan from FinWise/Upstart that was transferred to Glasser Images' account.

[¶131] On its 2020 income tax returns, Glasser Images reported a $630,229 loss.

***In the final year of its operation, Glasser Images remained in a poor financial condition that went undisclosed to unwitting consumers.***

[¶132] In 2021, the final year of Glasser Images' operation, Jack continued to seek

funding from every conceivable source.

[¶133] At some point during the year, Jack received approximately $10,000 from Jace's cousin.

[¶134] On January 20, 2021, Glasser Images was approved for, and later received, an additional $257,500 loan through the Paycheck Protection Program, bringing the total to $502,500.

[¶135] Jack applied for and received these funds for Glasser Images despite knowing that his business did not qualify for it.

[¶136] Aware that Glasser Images did not qualify for the second loan, on December 21, 2020, Jack suggested a way he could manipulate Glasser Images' revenue so that he could qualify the business to receive the funds: "We saw a decline in Q4, but I do not think it will be enough to amass a 25% decline from year to year unless we'd be able to break it out by category (ie commercial VS weddings)." Ex. 31 at p. 2 (HK 735).

[¶137] In the same conversation, Jack acknowledged that Glasser Images' losses had nothing to do with the pandemic but were due to "commercial revenue expansion in 2018 and 2019," and that Glasser Images "saw stable revenue (especially with weddings)" in 2020. Id.

[¶138] Despite having received a total of $395,000 through the Small Business Administration's PPP and EIDL programs (all of which was forgiven), *supra* ¶ 107, Jack continued his efforts to obtain funds for Glasser Images.

[¶139] On March 23, 2021, Jack sent an e-mail boasting that Glasser Images was "looking at closing out a solid and profitable 1st quarter!" Ex. 32 at p. 4 (Bravera 1484). Jack used this as a basis to request a loan from Bravera. Id.

[¶140] Again, Bravera declined to extend credit to Glasser Images because it needed to "see a good 18 months of profitability" before it would consider the request. Id.

[¶141] When Jack pressed the inquiry, Bravera advised him that it would need to see "a pattern of profitability and financial trends moving in the right direction," and that a positive quarter is an insufficient basis to extend the business additional credit. Id. at p. 3 (Bravera 1483).

[¶142] In a subsequent e-mail in the same discussion, Jack acknowledged that the pandemic relief funds "helped with cash flow," but the business remained in a "similar debt service position" as it was before. Id. at p. 2 (Bravera 1482).

[¶143] Three months later, on June 29, 2021, Jack contacted Bravera when Glasser Images' account was once more overdrawn because he wanted to know if declined transactions would clear if he made a deposit. Ex. 33 at p. 4 (Bravera 1570).

[¶144] In response, Bravera said:

> We will not be re-running or honoring any checks until you get this account positive. This account has had 235 NSF items since it was opened, which is unacceptable. You have had 10 items in just the last month.
>
> I want to make this clear: the management of this account is unacceptable, and we will not honor checks if you have no funds. **If this kind of account management continues we will be closing the account.**

Id. at p. 2 (Bravera 1570) (emphasis added).

[¶145] In response, Jack acknowledged the business's dire financial situation, though he placed the blame solely on the pandemic and not the business's poor financial condition predating the pandemic. Id.

[¶146] Two weeks later, on July 15, 2021, Jack contacted Bravera regarding two employee paychecks (totaling $4,029) that did not clear. Ex. 34 at p. 2 (Bravera 1779). Jack advised the bank he requested a loan from a family friend. Id.

[¶147] Another two weeks later, Jack again requested a loan from Bravera. This time, Jack requested a "super short-term loan" despite having been approved for an additional $350,000 SBA EIDL loan. Ex. 35 at p. 3 (Bravera 1786).

[¶148] Bravera declined Jack again, telling him that the SBA loan would not be a basis on which it would extend credit to Glasser Images. Id. at p. 2 (Bravera 1785).

[¶149] In or around September of 2021, Jack requested a modification of his earlier EIDL loans seeking an additional $1.5 million.

[¶150] At about this same time, September of 2021, First Western Bank concluded that Glasser Images' main asset was the approximately $500,000 "loan" given to Jack by the business. Infra ¶¶ 210 – 217.

[¶151] On or about October 4, 2021, the money tree finally and inevitably dried up when the Small Business Administration denied the $1.5 million loan modification after it determined that Glasser Images did not have the ability to repay the loan. Ex. 36 at p. 2 (GI 22984).

[¶152] On October 4, 2021, Jack requested reconsideration of the Small Business Administration's decision while citing business loss suffered in 2019. Ex. 37 at p. 2 (GI 23133). He also contended that the Small Business Administration should reconsider its decision because he was going to use the Small Business Administration's loan to pay off the approximately $1 million owed to First Western, the proverbial "rob Peter to pay Paul." Id. at pp. 2, 4 (GI 23133, GI 23135).

[¶153] Deciding he had no other options, on October 4, 2021, Jack asked a longtime friend and employee if her parents would give him a loan.[6] He did not disclose to her that the Small Business Administration had just denied his $1.5 million loan application.

[¶154] When his friend denied Jack's request for money, Jack closed Glasser Images three days later, October 7, 2021.

[¶155] In summary, Jack spent years funding Glasser Images utilizing every conceivable

---

[6] Jack's request to his longtime friend came not long after he asked another friend's father-in-law for a loan without involving his friend in the request. Jack was indignant that his friend was offended he had not involved her in the conversation.

funding source, including the government (over $1 million), banks (over $1 million), family, and friends. And the entire time, Glasser Images solicited advance payments from clients without disclosing its poor financial condition. Even if Glasser Images' poor financial condition was the result of the pandemic (it wasn't), the business should have and could have informed its clients and potential clients that Glasser Images might fail before it could perform the promised services.

[¶156] But not only did Glasser Images sell its services without disclosing its poor financial condition, it did so while contractually obligating its clients to utilize only its services. In other words, it contractually required its clients to rely solely on it even while it was at a near constant risk of failure.

> ### C.   Count 3: Glasser Images, Jack Glasser, and Jace Schacher diverted consumer advance payments to other contractual obligations or personal expenses. (Against Glasser Images, Jack Glasser, Jace Schacher.)

[¶157] The allegations made in all prior paragraphs are incorporated by reference as if fully set forth herein.

[¶158] In connection with the sale or advertisement of merchandise to persons in North Dakota, Defendants Jack, Jace, and Glasser Images acted, used, or employed deceptive acts or practices, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon, whether or not any person has in fact been misled, deceived, or damaged thereby, including by diverting consumer advance payments to other contractual obligations or personal expenses, in violation of N.D.C.C. § 51-15-02.

[¶159] In the alternative, Jack, Jace, and Glasser Images provided assistance or support to the other while the other engaged in the acts or practices alleged in Count 3, in violation of N.D.C.C. ch. 51-15, when they knew or consciously avoided knowing that the other was engaged in an act or practice in violation of N.D.C.C. ch. 51-15, in violation of N.D.C.C. § 51-15-02.3.

[¶160] Summarizing the allegations of Count 2:

a.  Glasser Images had a poor financial condition since at least 2017. As a result of its poor financial condition, Jack constantly sought and obtained funding from third parties, including from the government, banks and other financial institutions, family, and friends. But it was never enough.

b.  Jack could not have obtained the First Western loans without a friend agreeing to personally guarantee the loans.

c.  To cover his own mismanagement of Glasser Images, Jack invoked the COVID-19 pandemic as an excuse for the poor financial condition of his business, and he asked for additional credit from his banks falsely claiming his business had been harmed by the pandemic.

d.  In response to his many requests for credit, Jack was also told multiple times that the business's expenses were high and that he needed to reduce them.

[¶161] Fully aware of the facts above, Jack and Jace used Glasser Images to live an extravagant life funded by the business, including on the purchases described *infra*.

[¶162] ***Luxury vehicles.*** Jack and Jace each leased luxury vehicles the business paid for.

[¶163] On March 17, 2021, approximately two months after receiving the second disbursement of $257,500 through the Paycheck Protection Program, Jack and Jace entered into a 36-month lease for a 2021 Mercedes-Benz GLE450W4, costing the business $1,631.97 per month ($19,583.64 annually).

[¶164] Only six days after entering into the lease for the Mercedes, Jack requested a consolidation loan from Bravera and noted the business was in a "similar debt service position" as it was before receiving the Paycheck Protection Program funds. Supra ¶ 142.

[¶165] A month later, on April 22, 2021, Jack and Jace entered into a lease for a 2021

Audi S5 Quattro that cost $2,059.35 per month ($24,712.20 annually).

[¶166] Though the Audi was ostensibly paid for using Jack and Jace's personal checking account, the payments were covered by funds transferred to their personal checking account from Glasser Images' account on at least three occasions in 2021.

[¶167] After leasing luxury vehicles that the business paid for, Jack contacted Bravera about Glasser Images' overdrawn accounts and was told his management of the account was unacceptable. Supra ¶¶ 143 – 144. Jack blamed the pandemic. Supra ¶ 145.

[¶168] When questioned by the Consumer Protection Division of the Attorney General's Office why he did not lease a less expensive vehicle, Jack said he "had had two Mercedes before," and then acknowledged "[he] maybe could have gotten a, a less expensive vehicle."

[¶169] In addition to the cars themselves, Jack and Jace used business funds to have their cars detailed as often as once a week.

[¶170] *Travel.* Jack and Jace used business funds to pay for personal travel.

[¶171] On November 15, 2018, Jack contacted Bravera because he and Jace were traveling to Hawaii: "Jace and I will be traveling to Hawaii the end [sic] November. We leave 11/23 and fly back 12/1. Please put a note on the Glasser Images debit cards." Ex. 38 at p. 3 (Bravera 1626).

[¶172] Jack requested that Bravera increase "the ATM limit, daily limit, and point-of-sale limit on his and Jace's business debit cards." Id.

[¶173] It was at this same approximate time (late 2018) that Jack sought additional funding from First Western and was at a time that Glasser Images was over 90 days past due with vendors. Supra ¶¶ 59 – 61.

[¶174] It was only two months later that Jack told First Western that Glasser Images' checking account "dip[ped] negative," that Glasser Images was "just squeezing by but barely,"

and that payroll checks overdrew Glasser Images' account by $4,500. Supra ¶¶ 70 – 71.

[¶175] In another example, on or about May 28, 2021, Jack and Jace used Glasser Images' credit card to pay for a trip to Wyoming. Ex. 39 at pp. 3 – 5 (GI 25584 – GI 25585); Ex. 40 (GI 1284395 – GI 1284397). In total, Jack and Jace spent at least approximately $10,000 on the trip, with $8,001.92 for lodging alone. Ex. 39 at pp. 3 – 5 (GI 25584 – GI 25585).

[¶176] Approximately two weeks before Jack and Jace's Wyoming trip, Jack claimed to his accountant that Glasser Images qualified for $2 million in Economic Injury Disaster Loan funds based on its operating expenses and asked for the accountant's help and insight on obtaining the funding.

[¶177] A month after the trip to Wyoming, Jack contacted Bravera because Glasser Images' checking account was overdrawn, and he was told that his management of the account was unacceptable. Supra ¶¶ 143 – 44. And then two weeks later, he contacted Bravera about two employee paychecks that did not clear (totaling $4,029) and said that he was seeking a loan from a family friend. Supra ¶ 146.

[¶178] Using business funds, Jack and Jace also traveled to Fargo, Minneapolis, and South Dakota for personal reasons on multiple occasions between 2018 and 2021.

[¶179] ***Meals at high-end restaurants.*** On a regular basis, Jack and Jace used the funds of Glasser Images to pay for meals and drinks, including at Pirogue Grille ("Pirogue") and The Luft in Bismarck where they went multiple times a week.

[¶180] On one occasion, the business purchased a $400 meal for Jack's birthday at Pirogue.

[¶181] Jack and Jace's weekly meals cost the business hundreds of dollars that neither Jack nor Jace repaid.

[¶182] According to Jack, his and Jace's meals were recorded in the business's "meals

and entertainment account," and Jace submitted the expense reports to the business's accountant. Ex. 41 (GI 1283637, 1283666, 1283688).

[¶183] Glasser Images admitted the business paid for Jack and Jace's meals (and other personal expenditures) between 2018 and 2021.

[¶184] When questioned about the expensive meals, Jace said that "it was just a good disconnect and kind of a, it was just easier to go there, than go home after a long day and then make dinner."

[¶185] Jace also said that Pirogue was not any more expensive than *other* high-end restaurants in Bismarck, but that he and Jack "did have a preference to go to Pirogue."

[¶186] And indeed, they did. According to the Glasser Images' credit card statement, between May 15, 2020 and June 15, 2020 for example, Jack and Jace used business funds to pay for meals at Pirogue thirteen times (and Butterhorn four times). Ex. 42 at p. 4 (GI 25534).

[¶187] These purchases were made by Jack and Jace approximately a month and a half after Glasser Images received Paycheck Protection Program funds and just two weeks after Jack contacted First Western about the COVID-19 PACE Recovery Program. Supra ¶ 103.

[¶188] At the time, Jack said that he was "still concerned about [the] continued cash flow and stabilization" of Glasser Images. He then asked: "Isn't the point of the program to help provide low cost and long-term working capital to provide cash flow to help re-start businesses for those impacted by COVID-19, which [Glasser Images] [has] been?" Ex. 21 at p. 2 (FWBT 606).

[¶189] A year later, Jack and Jace continued their extravagant food and drink purchases. Between May 16, 2021 and June 15, 2021, for example, Jack and Jace used business funds to pay for food and alcohol at Pirogue, Butterhorn, Stage Stop Liquors, and Autumn Hills Liquors. Ex. 39 at pp. 4 – 5 (GI 25584 – GI 25585).

[¶190] Despite Jack's claim to his bank that he was concerned about the "cash flow and stabilization" of Glasser Images, Jack and Jace were not concerned enough to stop their wasteful food and drink purchases.

[¶191] ***Mortgage Payments.*** Jack and Jace paid their mortgage by transferring business funds to their personal checking account to cover their mortgage payment of approximately $1,730.00 on at least nine occasions in 2020 and 2021.

[¶192] ***Haircuts and Hair Care Products.*** Jack and Jace used business funds to pay for their frequent haircuts and hair care products. For example, Between May 15, 2020 and June 15, 2020, Jack and Jace spent $1,1991.10 for their haircuts and hair care products using business funds. Ex. 42 at p. 4 (GI 25534). A year later, between May 16, 2021 and June 15, 2021, Jack and Jace continued to use business funds to pay for their haircuts and hair care products. Ex. 39 at pp. 4 – 5 (GI 25584 – GI 25585).

[¶193] ***Plants.*** Jack and Jace used business funds to pay large amounts for plants. For example, between May 16, 2021 and June 15, 2021, Jack and Jace used business funds to purchase plants for themselves, spending at least $1,296.25. Id. Jace justified these personal purchases by claiming a couple of plants were not receiving enough light at the office.

[¶194] ***Subscription services.*** Jack and Jace used business funds to pay for a variety of frivolous subscription services for themselves, including for meal kits, smoothie kits, and alcohol kits. Just as with their mortgage and Audi payments, the business paid for their subscription services when Jack and Jace transferred business funds into their personal account.

[¶195] ***Transfers to personal account.*** In addition to the various purchases specifically identified above, the business subsidized other purchases and payments Jack and Jace made using their personal accounts. When they needed or wanted the additional funds for their extravagant lifestyle, or to cover necessary expenditures, Jack and Jace transferred funds from

the Glasser Images account into their personal account.

[¶196] For example, on or about April 3, 2020, when Glasser Images' account was negative and Jack and Jace's personal account was negative, Jack and Jace transferred business funds to their personal account to cover their negative balance.

[¶197] Notably absent from Jack and Jace's personal accounts are basic living expenses (e.g., fuel and groceries), because they used Glasser Images' funds to cover those expenses.

[¶198] **_Real Estate._** In and around June of 2020, at a time Jack now claims Glasser Images was negatively impacted by COVID-19, Jack and Jace pursued purchasing $750,000 in real estate using business proceeds. Ex. 25 at p. 3 (GI 599928); Ex. 26 at p. 2 (GI 599904).

[¶199] On June 24, 2020, Glasser Images' accountant advised Jack that he and Jace should not purchase land using business funds if the land was for personal use. Ex. 26 at p. 3 (GI 599905).

[¶200] Jack responded: "Yes, the land would be for personal use BUT it would be paid for with business cash flow – our salaries couldn't support the payments. Does that make a difference? Could I just do a loan to myself like I have been with any other personal expenses." Id. at p. 2 (GI 599904).

[¶201] Aware that his and Jace's efforts were wrongful, Jack asked how he could conceal their ownership of the real estate: "What about from a privacy sake – if I didn't want people knowing we owned it. Would a separate company make sense then?" Id.

[¶202] Jack and Jace's use of Glasser Images' funds to live their extravagant lifestyle was concealed in at least two ways: First, their personal expenditures were wrongfully recorded as legitimate "meals and entertainment" purchases by the business.

[¶203] And second, their personal expenditures were categorized in accounting software as a "loan" purportedly given to Jack by the business, though the business never approved the

"loan," and it was not a loan at all.

[¶204] Instead, the "loan to Jack" was a running total of *some* of the personal expenditures made by Jack and Jace using the business's funds. Jack acknowledged this to his accountant when he asked: "Could I just do a loan to myself like I have been with any other personal expenses?" Id.

[¶205] Aware that his use of business funds to subsidize his lifestyle was wrongful, Jack expressed concern to his accountant that he would have to produce bank statements pursuant to an Internal Revenue Service ("IRS") audit of Glasser Images' travel and advertising expenses: "When we turn over all bank statements, what if it prompts a red flag on something else (ie meals, loans from the company to me, etc)?" Ex. 43 at p. 3 (HK 234).

[¶206] Jack, Jace, and/or Glasser Images may Answer these allegations contending the IRS did not require them to file an amended return after completing its audit. However, the IRS did not audit Glasser Images' meals and entertainment expenses or the "loan to Jack" amounts.

[¶207] As of December 31, 2020, Glasser Images' "loan to Jack" totaled $499,111.02.

[¶208] Given the various methods Jack and Jace used to siphon Glasser Images' funds to themselves, $499,111.02 likely does not reflect the total amount they took from the business.

[¶209] Indeed, Glasser Images' financial records reflect significant amounts for "retained earnings" and "owner draw," neither of which appear appropriate.

### *Glasser Images' "loan" to Jack accounted for a majority of the business's total assets.*

[¶210] By late 2018, when Jack first contacted First Western seeking a $500,000 loan, he had already incurred at least approximately $330,000 in personal expenditures against the business.

[¶211] Jack blamed his accountant for this, claiming he did not know when he could take money from the business, saying he "wasn't advised when to take money out to keep this from

happening." Ex. 7 at p. 4 (FWBT 695).

[¶212] Whether true or not, Jack continued to use the business as his personal piggybank, he just falsely told his bank otherwise.

[¶213] Jack told First Western that he hadn't taken a "draw" against the business since 2017. Id. He did not tell First Western that he and Jace continued to use business funds to make personal expenditures. Id.

[¶214] Jack's representation that he hadn't taken a "draw" since 2017 is classic equivocation and evasion, meant to conceal from First Western that he and Jace were directly spending the business's funds on personal expenses. In other words, Jack and Jace spent Glasser Images' funds without the intervening step of taking an appropriate draw from the business. Supra ¶¶ 157 – 213; infra ¶¶ 215 – 222.

[¶215] By the end 2020, Jack and Jace had spent at least $499,111.02 of Glasser Images' funds on themselves.

[¶216] This amount was so high that it accounted for a majority of Glasser Images' total assets. In its 2021 financial summary of Glasser Images, First Western concluded:

> A majority of [Glasser Images'] Total Assets comes from Loans to Shareholders with a reported amount of [$499,000]. This was an increase of [$163,000] from the previous year. Please note that this was a loan to Jack himself from the business.

[¶217] Inexplicably, Jack testified to the Consumer Protection Division of the Attorney General's Office under oath on November 23, 2021 that the "loan" given to him by Glasser Images totaled only approximately $130,000.

### *Due to insufficient equity, Jack could not take draws from Glasser Images.*

[¶218] Jack and Jace's use of Glasser Images' funds to subsidize their lifestyle cannot be explained or justified by Jack taking draws from the business because he could not do so.

[¶219] It is appropriate for the owner of a business to take a draw and receive a disbursement where the business has sufficient equity at the time of the draw or anticipates it will have sufficient equity in the subsequent year.

[¶220] Glasser Images did not have sufficient equity prior to 2017 when Jack and Jace incurred $330,000 in personal expenditures against the business, and it did not have sufficient equity in any year between 2018 and 2021 when Jack and Jace incurred an additional $163,000 in personal expenditures against the business.[7]

[¶221] Jack and Jace's use of the business funds was wrongful, particularly where Glasser Images' funds included client advance payments. Jack and Jace's conduct is consumer fraud because the business did not disclose to clients that their payments were being used by Jack and Jace to fund their extravagant lifestyle while the business remained undercapitalized.

[¶222] In summary, Glasser Images solicited and accepted advance payments from consumers while failing to disclose, expressly, impliedly, or by omission of material fact, that the business was undercapitalized and/or in poor financial condition. Despite this, Jack and Jace used the business's funds for personal expenditures at a time when Glasser Images, Jack, and Jace knew or should have known the closure of Glasser Images was foreseeable and that their conduct risked imposing financial harm and expense on Glasser Images' clients, employees, and independent contractors.

**D.    Count 4: Glasser Images failed, refused, or was unable to provide the products or services promised to consumers. (Against Jack Glasser and Glasser Images.)**

[¶223] The allegations made in all prior paragraphs are incorporated by reference as if fully set forth herein.

---

[7] This total does not include personal expenditures that may have been categorized in Glasser Images' accounting software as "meals and entertainment" or another category.

[¶224] In connection with the sale or advertisement of merchandise to persons in North Dakota, Defendants Jack and Glasser Images acted, used, or employed deceptive acts or practices, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon, whether or not any person has in fact been misled, deceived, or damaged thereby, including by failing, refusing, or having an inability to provide the services promised to consumers for which Glasser Images received monetary consideration, in violation of N.D.C.C. § 51-15-02.

[¶225] In the alternative, Jack and Glasser Images provided assistance or support to the other while the other engaged in the acts or practices alleged in Count 4, in violation of N.D.C.C. ch. 51-15, when they knew or consciously avoided knowing that the other was engaged in an act or practice in violation of N.D.C.C. ch. 51-15, in violation of N.D.C.C. § 51-15-02.3.

[¶226] In or around October of 2020, Glasser Images terminated the employment of approximately half of its employees, including skilled photographers and editors, electing to rely on independent contractors to perform its services for clients.

[¶227] Jack later planned to layoff his entire staff and rely on independent contractors.

[¶228] The release of approximately half of Glasser Images' employees was a decision made by Jack as part of his "restructure" of the business to reduce the business's expenses.

[¶229] Jack decided for Glasser Images to release half of its employees, (including some of its skilled photographers and editors), to reduce expenses, but not to stop using the business to fund his extravagant lifestyle with Jace.

[¶230] Glasser Images did not, as a consequence of halving its staff, reduce the number of clients with whom it contracted.

[¶231] In fact, the business had more clients, year-over-year, since 2018, another fact contrary to Jack's narrative that the pandemic caused the failure of Glasser Images.

[¶232] To accommodate the greater number of contracted clients, Glasser Images retained approximately 150 independent contractors to photograph and video record weddings, and to edit the raw photographs and videos.

[¶233] But Jack's reliance on independent contractors caused the business to fail to keep its promises to clients in two significant respects: First, Glasser Images failed to provide a "second shooter" to everyone it promised; and second, Glasser Images failed to provide the quality of photography represented on its website to everyone with whom it contracted.

[¶234] ***Glasser Images failed to provide a promised "second shooter" to everyone it promised.*** As detailed above, Glasser Images routinely promised to provide two photographers to clients for wedding photography: a "primary shooter" and a "second shooter." <u>Supra</u> ¶ 21.

[¶235] On its website, Glasser Images represented the following to clients in a "Q&A":

**What happens if there's a snowstorm or my photographer has an emergency?** In 15+ years we've been in the business, we've never missed a wedding! We have backup plans in place and will make sure we are absolutely there, come snowstorm or the stomach flu.

[¶236] Glasser Images also represented on its website:

All of our Wedding Collections include the following:

**2 photographers** will be there to capture everything throughout the day. Having 2 photographers also provides tons of variety and ensures all of your moments are captured!

[¶237] Despite these promises, under oath Glasser Images admitted that it did not always provide a second shooter to everyone who was contractually promised one and admitted that when it failed to provide a second shooter, Glasser Images had broken its promise to the client.

**AG:** Did Glasser Images always provide a second shooter to everyone who was contractually promised one?

**Jack:** No.

**AG:** Why, Why not?

**Jack:**  Uh, shortage of work, uh, again, not to reference other businesses, but, you know, I mean, there's, there's a shortage of work, uh, around this country and, and, and, and whatnot. And, uh, and so sometimes it was very difficult to secure that, that second photographer.

**AG:**  So, if Glasser Images cannot provide a second shooter as promised, doesn't that mean that Glasser Images broke its promise to the client?

**Jack:**  Uh, I suppose yes.

[¶238] Glasser Images' misrepresentations to its clients seriously affected them and

negatively impacted their wedding day.

[¶239] While under oath, a client described her experience:

**Client #1:**  Yes. Um, we hired them and they were supposed to send two photographers to our wedding and we only received one photographer. They did not tell us until 10 minutes as I was walking into the church to put my dress on, that there would only be one photographer that day. So that was quite upsetting to figure out, you know, 10 minutes before your first look with your groom, to find out that it wouldn't be captured the way you would imagine it to be captured. So that happened. And then the other problem, like day of the wedding, um, they did a whole questionnaire like a month before the wedding, about the order of events and what was happening, so that way they could follow it, and then the bride wouldn't have to think at all. And they also called me two weeks before the wedding and talked to me for a half hour to make sure all the family photos for who was in each photo was lined out, so I wouldn't have to think. None of that happened the day of the wedding so that she was constantly asking me, okay, who's in this photo, who's in this photo. So it was like, none of those events ever even occurred. I wasted a bunch of time detailing out all these photos I wanted and who was in the photos for no reason. So that was day of the wedding, I would say. [ ... ] So there's that, and then we were supposed to receive $300 product credit to the store, which we never got to be able to use before they shut down. They also had a freebie promotion for their 15th year anniversary of 15th free photos, which we also never got. And then after the wedding, it took 'em three days, I believe, before they finally reached out to us email form at 6:00 p.m., at night saying, we're sorry, we missed a photographer. Here's $300 of product credit, instead of here's a refund. So we called them, and tried to get actual money back. And they told us that the second photographer is not part of like, our payment that we're paying them, it's just a bonus. Even though their website states, they will always send two photographers, no matter of sickness, health, whether everything. So that was frustrating. That was the reason we picked them was they're a big company and that they would always have two available to send two a day and not miss out on that.

[¶240] When the client excerpted above contacted Glaser Images about its failure to

38

provide the promised second shooter, Glasser Images responded by falsely claiming the second shooter was merely a bonus: "Second photographers are built into all our packages and not billed as a separate service to you. This is built in as a nice extra for our couples and not as a portion of the package." Ex. 44 at p. 2 (GI 1019128). Glasser Images made this claim notwithstanding that it prohibited its clients from utilizing another photographer. Supra ¶ 24.

[¶241] Since Glasser Images promised a second shooter to clients in its contracts and advertisements, *supra* ¶ 21, its e-mailed response that the promised second shooter was a "nice extra" was false and part of its effort to deny a refund and evade responsibility.

[¶242] **Glasser Images failed to provide the quality of photography represented on its website to everyone with whom it contracted.** Even when Glasser Images did provide the promised number of shooters to clients, it did not always provide the quality of products and services it advertised.

[¶243] Glasser Images advertised its services on its own website, social media, and other websites, including the weddingwire.com and theknot.com.

[¶244] Glasser Images advertised its services using the edited photographs of its most skilled photographers and editors, those rated "amazing" on its internal spreadsheet. Infra ¶ 250.

[¶245] As part of its sales pitch, Glasser Images and Jace represented to clients that its photographers and videographers were trained, even though Glasser Images did not train its photographers and videographers in the art of photography, videography, or Glasser Images' style.

[¶246] According to Jace, Glasser Images represented to clients that it trained all of its photographers and videographers, but it did not actually do so:

AG: Okay. Did you ever represent to clients that all, or that Glasser Images trained all of its photographers or videographers?

39

**Jace:** I would say yes, and I say that because with our process we would go through our specific process with them. As far as the way that they were trained for that skill, wasn't always up to us. I mean, if they went to school, we weren't paying for their tuition or if it came naturally, we had nothing to do with that.

[ ... ]

**AG:** No, and I'm not trying to pick on you, but...So if, if Glasser Images vetted its photographers, then it didn't from what you're saying, didn't need to train. So it did not train its, its photographers or, and videographers, is that right?

**Jace:** Correct. We didn't train because they were already vetted and they met the kind of quote unquote standard that we already had.

[¶247] Because Glasser Images released half of its employees in October of 2020, and had more clients year over year since 2018, it relied on many independent contractors to fulfill its promises to its consumers.

[¶248] Though Glasser Images utilized some skilled independent contractors to photograph and edit client wedding photographs, it also relied on photographers and editors who were not as skilled and could not provide the same quality of photographs used by Glasser Images in its advertising.

[¶249] Defendants may Answer these allegations in the same way that Glasser Images responded to client complaints about their poor-quality photographs: by claiming that photograph quality is entirely subjective.

[¶250] But this is not the case, and Glasser Images recognizes it, because it maintained a spreadsheet of its photographers and editors with the following breakdown of their skill:

| Internal Rating | # of photographers/editors rated |
|---|---|
| Amazing | 20 |
| Good | 23 |
| Needs training and improvement | 15 |
| Should remove after more hires | 4 |
| New | 65 |
| Unsure | 38 |

[¶251] Therefore, Glasser Images itself recognizes that the majority of its photographers and editors (42) are not "amazing," but are "good," "need training and improvement," or "should be removed" after more photographers and editors are hired. An even larger number (103) have no rating at all.

[¶252] The client excerpted above said of the photographs Glasser Images delivered to her:

> **Client #1:** And then we waited a month to receive our sneak peeks, which were terrible. They were all dark, we couldn't see our faces. And then we waited additional two, over two months after that to receive a full package. And again, all the photos were just very dark, not what their online presence looked like. And, um, after the event, I realized that they only spent five minutes with my husband and I. So in the end we have all of three photos of the two of us, none of, none of 'em, we're both looking at the camera, and they're all the same exact pose. So we really have no photos of us, and all the photos of our family, our faces are dark.

[¶253] Another client, before contracting with Glasser Images, was promised a particular photographer, (one rated "amazing" by Glasser), only to be told later that the promised photographer was not available. In the promised photographer's place, Glasser Images scheduled a different photographer, one it rated "needs training and improvement."

41

[¶254] The client said of the "needs training and improvement" photographer's gallery:

**Client #2:** Um, laughter looking through the pictures, the photo quality itself was terrible. Um, photo quality was the equivalent of giving a 10 year old, an iPad, and having them take pictures of your wedding. Uh, the color was terrible, the angles were terrible, um, there was no attention to detail in the pictures. Um, everyone like in the, the pictures, like I'm glad the couple got married. I, it looked like they had a grand time. It looked like they paid or gave, you know, a high hundred bucks to somebody's niece to go take pictures, or niece or nephew to go take pictures of their wedding, um, super budget style. Um, and that was not what I was going for, for that. Um, I guess, yeah, that lack of attention to detail, the lack of attention to color, um, the pictures looked really washed out to me. Um, some of them were grainy. Uh, a lot of them were out of focus and I think that was also a huge thing. Um, like if we're taking a picture of the bride and groom, why is it focused in on, you know, the caterer in the back, <laughing>, um, that kind of situation. And I just, I was not okay with that. And I thought it might have been like wedding nerves kind of thing, just stressing out. But I had some friends that were, uh, dabbled in photography on the side, or actually had photography businesses and were unable to do our wedding because they already booked. I had them look over those, uh, galleries as well, and they confirmed what I was seeing and they're like, yeah, no, this isn't, I, I, I see what you're talking about. I understand and I, I feel like you're justified at not wanting to pay that kind of money for that low quality.

[¶255] On the issue of subjectivity, the client (who dabbles in photography herself) answered as follows:

**AG:** Was there a point in your communications with Glasser Images, um, regarding Beth specifically, that Jack or anyone else from Glasser Images told you that photography is highly subjective?

**Client #2:** Yes.

**AG:** Is that true? Do you agree with that?

**Client #2:** Yes. Um, to a point there. I would say photography, there's a lot of different styles, but at the end of the day, there's quality photography and then there's amateur.

[¶256] Unbeknownst to the client, Glasser Images contacted at least four different photographers, trying to find anyone it could, before scheduling the "needs training and improvement" photographer in place of the "amazing" photographer.

[¶257] According to former Glasser Images employees, the business frequently needed a

"warm body" to shoot client weddings, an effort made more difficult by Glasser Images' reputation that it did not pay photographers. Infra ¶¶ 271 – 283.

[¶258] Because Glasser Images refused to provide a refund to the client, (even though it broke its promise to her), she ultimately accepted a gift card that she then sold to someone else. The person to whom the client sold the gift card was then unable to use the gift card because Glasser Images ceased operations.

[¶259] In summary, Glasser Images advertised its products and services using the edited photographs of its most skilled photographers and editors only to provide photographs shot and edited by less skilled independent contractors.

### E.   Count 5: Does 1 – 100 facilitated and assisted the deceptive acts, practices, or misrepresentations alleged in this Complaint. (Against Does 1 – 100.)

[¶260] The allegations made in all prior paragraphs are incorporated by reference as if fully set forth herein.

[¶261] Does 1 – 100 provided assistance or support to Glasser Images while it was engaged in an act or practice in violation of N.D.C.C. ch. 51-15 when they knew or consciously avoided knowing that Glasser Images was engaged in an act or practice in violation of N.D.C.C. ch. 51-15, in violation of N.D.C.C. § 51-15-02.3.

[¶262] Does 1 – 100 facilitated and assisted Count 1 of the Complaint which alleges that Glasser Images solicited advance payments from clients and contracted with clients to provide products or services, and then failed to provide the products, services, or refund after it abruptly closed on October 7, 2021. Supra ¶¶ 12 – 41.

[¶263] Glasser Images' sudden closure impacted those consumers who (1) paid advance payments to Glasser Images and received nothing, including a refund; (2) paid advance payments to Glasser Images, had their wedding photographed, but have not received their photographs,

whether edited or unedited; (3) paid advance payments to Glasser Images, had their wedding photographed, but only received unedited photographs, and not the promised edited photographs; (4) paid advance payments to Glasser Images and obtained their photographs, edited or unedited, only after paying their photographer (who Glasser Images did not pay) directly, effectively paying twice. Supra ¶ 40.

[¶264] After releasing half of its staff in October of 2020, Glasser Images contracted with independent contractors to provide its products or services to clients, including Does 1 – 100 who took photographs, recorded video, and/or edited photographs or videos.

[¶265] Glasser Images' independent contractors, including Does 1 – 100, did not contract directly with Glasser Images' clients.

[¶266] Prior to Glasser Images' abrupt closure, Does 1 – 100 photographed or video recorded weddings, and/or were in the process of editing photographs or videos for Glasser Images' clients.

[¶267] When Glasser Images abruptly closed, it owed Does 1 – 100 payment for work they performed for it which it did not and has not paid.

[¶268] Despite the absence of privity between Does 1 – 100 and Glasser Images' clients, Does 1 – 100 have withheld or are withholding from clients: (1) final edited photographs or video, or (2) unedited photographs or video.

[¶269] Does 1 – 100 refuse to provide (1) final edited photographs or video, or (2) unedited photographs or video to clients due to nonpayment by Glasser Images.

[¶270] Therefore, Does 1 – 100 are or were facilitating and assisting Glasser Images' deceptive acts and practices as alleged in Count 1.

**F.     Count 6: Glasser Images contracted with independent contractors to perform its services for clients, but then failed, refused, or was unable to pay its independent contractors. (Against Jack Glasser and Glasser Images.)**

[¶271] The allegations made in all prior paragraphs are incorporated by reference as if fully set forth herein.

[¶272] In connection with the sale or advertisement of merchandise to persons in North Dakota, Defendants Jack and Glasser Images acted, used, or employed deceptive acts or practices, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon, whether or not any person has in fact been misled, deceived, or damaged thereby, including by failing, refusing, of having an inability to pay its independent contractor for services rendered on Glasser Images' behalf, in violation of N.D.C.C. § 51-15-02.

[¶273] In the alternative, Jack and Glasser Images provided assistance or support to the other while the other engaged in the acts or practices alleged in Count 6, in violation of N.D.C.C. ch. 51-15, when they knew or consciously avoided knowing that the other was engaged in an act or practice in violation of N.D.C.C. ch. 51-15, in violation of N.D.C.C. § 51-15-02.3.

[¶274] In addition to its clients, Glasser Images deceived its independent contractors.

[¶275] As alleged above, Glasser Images contracted with independent contractors to provide its products or services to clients, including those who took photographs, recorded video, and/or edited photographs or videos.

[¶276] In exchange for taking photographs, recording video, and/or editing photographs or video, Glasser Images promised payment to its independent contractors.

[¶277] To induce independent contractors to perform work for Glasser Images despite the business's failure to pay, Jack strung independent contractors along, as one contractor describes while under oath in the following exchange:

**AG:** Did you, did you talk to Jack about that first unpaid invoice or old invoice?

45

**Contractor:** Right. So the way it works is, um, with some in my contract, uh, we're on a 30-day pay scale. Um, so at the end of 30 days, usually he would send me a check and then that check would take a week or so to get to me since I'm in Georgia. So, I sent my invoice, maybe July 30th. So, I contacted him at the end of August and I was saying, hey where's my check. Um, and then, you know, the first week of September, he says, I don't know where it is. Must have got lost in the mail, let me resubmit it to you and then said, okay, I can, I can do that. Um, and, then, uh, he said again, you know, a week later I expected it and he, he gave me the same story. So then at the end of September, I was actually shooting in Bismarck and I was like, Jack, I need this money, we talked about this. Uh, I'm in Bismarck right now, I can come into the studio, I can get the check. And he is like, how about we wait till Monday, and this is early October now. Uh, we'll wait till Monday, and, uh, Sierra, my accountant will come in and she'll PayPal you the money. And then Monday comes, he says he has a family emergency. And then, uh, he just says he can't do it. So, uh, he never paid me. So.

**AG:** So this conversation you just described that happened in October.

**Contractor:** Um, it happened throughout August, or I was checking up on the check in August, but mainly my concerns started in September. Um, uh that's when I started email him, emailing him frequently asking where my check was. And I also have, uh, screenshots of our email conversations and text conversations that I can send over to you.

**AG:** Okay. But the, you, you mentioned that you told him and that you were in Bismarck and that he could have his accountant get some, or write a check for you. When was that, that you were here and that you had that conversation with him?

**Contractor:** Um, let me make sure here. That was, uh, Friday, October 1st.

**AG:** Okay. So, so really that turned out to be just a few days before he closed the business?

**Contractor:** Right? Yes. But, um, you know, I was asking him, um, you know, he was telling me that he was resending the checks throughout September, but I, I don't think he actually did, because I've never had an issue of a check being lost before. So.

[¶278] In total, Glasser Images owes the independent contractor quoted above approximately $26,000.

[¶279] Former employees were similarly deceived by Jack and Glasser Images:

**AG:** Okay. Um, so were there occasions where you, whether, I guess whether

you're full-time or part-time, but while you were, say, doing a shoot that you were expecting to have a second shooter and you didn't have one?

**Former Employee:** Absolutely. Um, and, uh, the most recent, um, version of that, uh, was actually the last wedding I just shot, uh, the last week of September. Um, I wasn't assigned, uh, for this wedding at first. Um, it was in Great Falls, Minnesota, uh, over, I think the 25th, 26th, and, 27th. Um, originally I was attending a, uh, Rough Rider Tattoo Convention in Fargo, um, with my current place of employment. Um, but last minute, uh, week of, Jack contacted me and asked if I could shoot a wedding for him in Great Falls, Minnesota. Um, and I said, um, well, in that email, he had promised a bonus for shooting it. Um, a, and I said, uh, under two circumstances, I'll go shoot the wedding. Um, I want the bonus, and then, uh, I had booked a hotel for, um, my weekend in Fargo. Um, and I wanted him to reimburse me for that. Um, and he agreed to it. And so I went, shot the wedding in Great Falls, and then, of course, October 7th, or whatever happened, um, and I never saw that.

**AG:** So you never got the bonus you were promised?

**Former Employee:** Um, never got the bonus I was promised, I never got the reimbursement for the hotel. Um, I never got paid the, uh, hours that I worked for that weekend. Um, the whole thing.

[¶280] At the time of its closure, Glasser Images owed its independent contractors payment for the services they provided to Glasser Images.

[¶281] Glasser Images admitted that it owed its independent contractors a substantial amount:

**AG:** How much does Glasser Images owe its subcontractors?

**Jack:** Probably around a hundred thousand. Again, I would have to review that. Um, and, uh, there is also several subcontractors who hadn't, or still haven't submitted, uh, invoices, so we'd have to figure that out too. Um, but I would, I would say around a hundred thousand.

[¶282] Glasser Images' failure to pay its independent contractors mirrors the misrepresentations to its clients.

[¶283] And while Glasser Images failed to pay its independent contractors, Jack and Jace fleeced the business to live an extravagant life to which they felt entitled.

[¶284] Defendants' actions constituting violations of N.D.C.C. §§ 51-15-02 and 51-15-

02.3 include the following acts and practices:

    a.   Glasser Images and Jack Glasser by making untrue, deceptive, and misleading representations, or engaging in deceptive acts or practices, with the intent that others rely thereon, in violation of N.D.C.C. § 51-15-02, including by contracting with consumers and then failing to provide the product or service.

    b.   Glasser Images and Jack Glasser by making untrue, deceptive, and misleading representations, or engaging in deceptive acts or practices, with the intent that others rely thereon, in violation of N.D.C.C. § 51-15-02, including by contracting with consumers without disclosing it was undercapitalized and/or in poor financial condition and could fail at any time.

    c.   Glasser Images, Jack Glasser, and Jace Schacher by making untrue, deceptive, and misleading representations, or engaging in deceptive acts or practices, with the intent that others rely thereon, in violation of N.D.C.C. § 51-15-02, including by diverting consumer advance payments to other contractual obligations or personal expenditures.

    d.   Glasser Images and Jack Glasser by making untrue, deceptive, and misleading representations, or engaging in deceptive acts or practices, with the intent that others rely thereon, in violation of N.D.C.C. § 51-15-02, including by contracting with consumers and then failing to provide the represented products or services.

    e.   Does 1 – 100 by providing assistance or support to any person engaged in any act or practice in violation of N.D.C.C. ch. 51-15 while knowing or consciously avoiding knowledge that Glasser Images and Jack Glasser were in engaged in an act or practice in violation of N.D.C.C. ch. 51-15.

    f.   Glasser Images and Jack Glasser by making untrue, deceptive, and misleading

48

representations, or engaging in deceptive acts or practices, with the intent that others rely thereon, in violation of N.D.C.C. § 51-15-02, including by contracting with independent contractors to perform services but then failing to pay its independent contractors.

[¶285] Defendants' actions constitute consumer fraud under N.D.C.C. § 51-15-02.

## VI. CONSUMER FRAUD LAW VIOLATIONS
## (N.D.C.C. § 51-15-01, et seq.)

[¶286] Plaintiff re-alleges Paragraphs 12 through 285 of this Complaint.

[¶287] Defendants engaged in deceptive acts or practices in violation of N.D.C.C. § 51-15-02 for which North Dakota is entitled to relief, including injunctive relief, penalties, costs, expenses, and attorney fees.

[¶288] Defendants intended consumers to rely on their representations.

[¶289] The deceptive acts or practices alleged in Paragraphs 12 through 285 of this Complaint constitute violations of N.D.C.C. §§ 51-15-02 or 51-15-03.2 for which the Court:

 a. May order injunctive relief as provided in N.D.C.C. § 51-15-07 or as otherwise provided by law;

 b. May order Defendants to pay to the State of North Dakota a civil penalty of up to $5,000.00 for each violation as provided in N.D.C.C. § 51-15-11;

 c. Shall order Defendants to pay to the State of North Dakota the costs, expenses, and attorney's fees incurred by the Attorney General in the investigation and prosecution of this action as provided in N.D.C.C. § 51-15-10, if Defendants are adjudged in violation of N.D.C.C. ch. 51-15; and

 d. May order such relief as may be necessary to prevent the use or employment of deceptive acts or practices by Defendants or to restore any loss suffered by

persons as a result of the deceptive acts or practices of Defendants as provided in N.D.C.C. § 51-15-07.

## VII. PERSONAL LIABILITY/CONSPIRACY

[¶290] North Dakota hereby realleges and incorporates by reference the allegations of Paragraphs 12 through 285, as if fully restated herein.

[¶291] Defendants Glasser Images and Jack Glasser knowingly entered into a deceptive scheme to violate North Dakota law, established and executed a company policy consistent with that scheme, approved of the conduct which was in violation of the law, was in a position to exercise control over the business entities involved, personally derived benefit from the conduct of the business entities, recruited others to participate in the scheme and had a duty to monitor the conduct of the employees, agents and the like to prevent violation of the law.

[¶292] Upon information and belief, Defendant Glasser Images does not observe all corporate formalities.

[¶293] By virtue of its instances of consumer fraud and other violations of North Dakota law, Defendant Glasser Images, LLC, which purports to be a business form which shields the individual persons comprising it from personal liability, has forfeited that protection and, therefore, the members, managers, and governors are personally liable, jointly and severally, for the actions and obligations thereof.

[¶294] The Court should "pierce the corporate veil" and declare Defendant Jack Glasser is not entitled to protection from personal liability and rather is jointly and severally liable for all conduct and obligations of Glasser Images, LLC, its agents and employees. Under oath, Jack, answering as the agent of Glasser Images, admitted the line between himself and the business was ephemeral: "... I was the business, the business was me, you know?"

[¶295] Defendants Glasser Images and Jack Glasser are engaged in a combination of two or more persons who have agreed to act together to inflict a wrong or an injury upon another, or who have agreed to act together to commit a lawful act using unlawful means to inflict a wrong or injury upon another, namely violation of North Dakota law, *supra*. In so doing, Defendants have committed acts in pursuit of the agreement and the agreement has proximately caused damage to North Dakota and its consumers.

[¶296] Defendants Glasser Images and Jack Glasser are liable for being a party to a conspiracy to violate North Dakota law.

[¶297] In addition to being liable for being a party to a conspiracy to violate North Dakota law, Defendants Glasser Images and Jack Glasser are liable for his/its own misconduct and/or for directing others to commit a wrong. See e.g. Zimprich v. North Dakota Harvestore Sys., Inc., 419 N.W.2d 912, 914 (N.D. 1988); Rickbeil v. Grafton Deaconess Hosp., 23 N.W.2d 247, 257 (N.D. 1946) ("The general rule with reference to this feature is considered and set out in the great series of volumes of jurisprudence familiar to the courts. In *52 Am. Jur. 440*, this rule is stated, 'It is a conceded general rule that all persons or entities are liable for torts committed by them, or by their agents while acting within the scope of their duties.'").

[¶298] Defendant Jack Glasser, who is a natural person, will additionally be subject to personal liability for corporate misconduct. See, Hilzendager v. Skwarok, 335 N.W.2d 768 (N.D 1983) (quoting Schriock v. Schriock, 128 N.W.2d 852, 866 (N.D. 1964) ("'... but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.'  Fletcher, Private Corporations Sec. 41 (1963 rev. vol.).").

[¶299] The crime/fraud exception to the protections of corporate form has long been recognized in North Dakota, "neither law nor equity will ever recognize the right of a corporate

entity to become the receptacle or cover for fraud or wrong based on deception for the purpose of defeating the right of innocent parties." See, McFadden v. Jenkins, 169 N.W. 151, 163 (N.D. 1918). See also, Danks v. Holland, 246 N.W.2d 86 (N.D. 1976); Family Center Drug v. North Dakota St. Bd. of Pharm., 181 N.W.2d 738, 745 (N.D. 1970).

## VIII. INVOLUNTARY DISSOLUTION OF GLASSER IMAGES, LLC

[¶300] North Dakota hereby realleges and incorporates by reference the allegations of Paragraphs 12 through 285, as if fully restated herein.

[¶301] Under N.D.C.C. § 51-15-07, "The court may make an order or judgment as may be necessary to prevent the use or employment by a person of any unlawful practices …"

[¶302] Defendant Glasser Images and Jack Glasser's acts and practices, described *supra*, permit the Court, pursuant to an action by the Attorney General, to dissolve Glasser Images, LLC under N.D.C.C. § 51-15-07. Defendants' actions in violation of N.D.C.C. ch. 51-15 constitute unauthorized acts and/or actions that constitute surrender of the corporate privileges for which the Court may involuntarily dissolve Glasser Images, LLC. Defendant Jack Glasser should not be permitted to maintain a corporate entity used to perpetrate consumer fraud.

## IX. REQUEST FOR RELIEF

[¶303] WHEREFORE, PLAINTIFF PRAYS for judgment against Defendants as follows:

a. That Defendants be adjudged in violation of the consumer fraud law and N.D.C.C. § 51-15-02 for engaging in the deceptive acts and practices alleged in this Complaint.

b. That Defendants, their agents, employees, representatives, assigns, and all other persons in active concert or participation with them, pursuant to N.D.C.C. § 51-15-07, be permanently enjoined and restrained from engaging in deceptive

acts or practices and from directly or indirectly making false statements, false promises, or misrepresentations with the intent that others rely thereon, in violation of N.D.C.C. § 51-15-02, while engaging in the sale or advertisement of photography services, or any other merchandise as defined by N.D.C.C. § 51-15-01(3), within the State of North Dakota.

c.  That Defendants, their agents, employees, representatives, assigns, and all other persons in active concert or participation with them, pursuant to N.D.C.C. § 51-15-07, be permanently enjoined and restrained from engaging in the sale of merchandise as defined by N.D.C.C. § 51-15-01(3).

d.  That Defendants, their agents, employees, representatives, assigns, and all other persons in active concert or participation with them, pursuant to N.D.C.C. § 51-15-07, be permanently enjoined and restrained from providing photography or videography services within North Dakota.

e.  That, under N.D.C.C. § 51-15-07, Defendants be enjoined and restrained from operating a photography or videography business under a trade name, requiring licensure under N.D.C.C. ch. 47-25, and from operating, participating, or engaging in any photography business in North Dakota.

f.  That, pursuant to N.D.C.C. § 51-15-07, Defendants, their agents, employees, representatives, assigns, and all other persons in active concert or participation with them, be permanently enjoined and restrained from soliciting or accepting from consumers advance payments or consumer deposits in connection with any sale of merchandise, as defined by N.D.C.C. § 51-15-01(3).

g.  That, pursuant to N.D.C.C. § 51-15-11, Defendants be assessed a civil penalty of $5,000.00 for each violation of N.D.C.C. § 51-15-02.

h.   That, pursuant to N.D.C.C. § 51-15-10, the Attorney General be awarded, and Defendants be ordered to pay all costs, expenses, and attorney's fees incurred by the Attorney General in the investigation and prosecution of this action.

i.   That, pursuant to N.D.C.C. § 51-15-07, Defendants be ordered to pay restitution to all consumers, which have suffered any ascertainable loss, and to restore to any person in interest any moneys or property, real or personal, which may have been acquired by Defendants by means of any practice declared to be unlawful under N.D.C.C. § 51-15-02.

j.   That, pursuant to N.D.C.C. § 51-15-07, the Court determine were appropriate that an award of restitution is inadequate to compensate for the harm caused by Defendants' deceptive acts or practices and order specific performance, including by ordering delivery of photographs and video to any impacted person.

k.   That, pursuant to N.D.C.C. § 51-15-07, Defendant Glasser Images, LLC be involuntarily dissolved.

l.   That Plaintiff be given such other and further relief as the nature of this case may require and this court may determine to be fair, just, and equitable.

Dated this 3rd day of May, 2022.

State of North Dakota
Drew H. Wrigley
Attorney General

BY:   /s/ Brian M. Card
Brian M. Card, ID No. 07917
Parrell D. Grossman, ID No. 04684
Assistant Attorneys General
Office of Attorney General
Consumer Protection & Antitrust Division
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Telephone (701) 328-5570

bmcard@nd.gov
pgrossman@nd.gov

Attorneys for Plaintiff.

# EXHIBIT 2

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Bankr. No. 20-50017 |
| | ) | Chapter 7 |
| TYLER STEVEN HOFLAND | ) | |
| SSN/ITIN xxx-xx-3501 | ) | |
| | ) | ORDER RE:  AUTOMATIC STAY |
| and | ) | AS TO SUBPOENA ENFORCEMENT |
| | ) | OR CONSUMER PROTECTION |
| BRIANNE ELIZABETH HOFLAND | ) | ACTIONS AGAINST DEBTORS BY |
| SSN/ITIN xxx-xx-3541 | ) | THE STATE OF NORTH DAKOTA |
| | ) | |
| Debtors. | ) | |

A hearing on the Attorney General of the State of North Dakota's Motion for Relief From Automatic Stay Under 11 U.S.C. § 362(b)(4) (doc. 17) was held April 9, 2020, with appearances as noted in the hearing minutes.  Pursuant thereto, and in recognition of and compliance with the findings and conclusions entered on the record; and for cause shown; now, therefore,

IT IS HEREBY ORDERED the Attorney General's motion is granted as provided herein, and the filing of Debtors' petition does not, pursuant to 11 U.S.C. § 362(b)(4), operate as a stay of the State of North Dakota's subpoena enforcement action or any consumer protection action against Debtors, as those actions are further described in the motion, or the enforcement of any resulting judgment, other than a money judgment against Debtors personally or against property of the bankruptcy estate.

So ordered:  April 9, 2020.

BY THE COURT:

Charles L. Nail, Jr.
Bankruptcy Judge

**NOTICE OF ENTRY**
Under Fed.R.Bankr.P. 9022(a)

This order/judgment was entered
on the date shown above.

Frederick M. Entwistle
Clerk, U.S. Bankruptcy Court
District of South Dakota

Brian M. Card (NDBID 07917)
Assistant Attorney General
Office of Attorney General of North Dakota
Consumer Protection & Antitrust Division
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
bmcard@nd.gov

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NORTH DAKOTA

## FARGO DIVISION

* * * * *

| | |
|---|---|
| In re: | Case No: BK-22-30244 |
| JACK A. GLASSER, | Chapter 7 |
| Debtor. | **NOTICE OF MOTION FOR RELIEF FROM AUTOMATIC STAY UNDER 11 U.S.C. § 362(b)(4)** |

[¶1]    The State of North Dakota ex rel. Drew H. Wrigley, Attorney General ("State") has filed papers with the Court seeking relief from the automatic stay under 11 U.S.C. § 362(b)(4).

[¶2]    **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.)**

[¶3]    If you do not want the court to grant the State relief from the automatic stay under 11 U.S.C. § 362(b)(4), or if you want the Court to consider your views on the State's motion, then on or before **August 31, 2022**, you or your attorney must file a written response with the Court at:

> Bankruptcy Clerk's Office
> Quentin N. Burdick United States Courthouse
> 655 1st Ave North, Suite 210
> Fargo, ND 58102

[¶4]    If you mail your written response to the court for filing, you must mail it early enough so the court will receive it on or before the date stated above.

[¶5]     You must also send a copy to:

Brian M. Card
Assistant Attorney General
Consumer Protection & Antitrust Division
Office of Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND  58504-7736

[¶6]     Hearing on the State's Motion for Relief from the Automatic Stay under 11 U.S.C.

§ 362(b)(4) is not yet scheduled. If you timely file an objection to the relief sought by the State,

the Court may set a hearing date. If you or your attorney do not take these steps, the court may

decide that you do not oppose the relief sought in the State's motion and may enter an order

granting that relief.

Dated this 17th day of August, 2022.

**STATE OF NORTH DAKOTA**
Drew H. Wrigley
Attorney General

By:      /s/ Brian M. Card
Brian M Card
ND State ID No. 07917
Assistant Attorney General
Consumer Protection & Antitrust Division
Office of Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND  58504-7736
Telephone (701) 328-5570
Facsimile (701) 328-5568
bmcard@nd.gov

Brian M. Card (NDBID 07917)
Assistant Attorney General
Office of Attorney General of North Dakota
Consumer Protection & Antitrust Division
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
bmcard@nd.gov

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NORTH DAKOTA

## FARGO DIVISION

* * * * *

| | |
|---|---|
| In re: | Case No: BK-22-30244 |
| JACK A. GLASSER, | Chapter 7 |
| Debtor. | **CERTIFICATE OF SERVICE** |

[¶1]    I hereby certify that on August 17, 2022, I caused to be filed electronically the State of North Dakota's Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362(b)(4) with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter who are on the CM/ECF system.

[¶2]    I hereby certify that on August 17, 2022, I served the (1) Motion for Relief from Automatic Stay under 11 U.S.C. § 362(b)(4); (2) Exhibits 1-2 to Motion for Relief from Automatic Stay under 11 U.S.C. § 362(b)(4); (3) Notice of Motion for Relief from Automatic Stay under 11 U.S.C. § 362(b)(4); and (4) Certificate of Service upon the following by placing true and correct copies thereof in an envelope addressed as follows:

Jack A. Glasser
5210 Prairiewood Drive
Bismarck, ND 58504

and depositing the same, with prepaid postage, in the United States mail at Bismarck, North

Dakota, as first class mail.

Dated this 17th day of August, 2022.

**STATE OF NORTH DAKOTA**
Drew H. Wrigley
Attorney General


By:      /s/ Brian M. Card
Brian M Card
ND State ID No. 07917
Assistant Attorney General
Consumer Protection & Antitrust Division
Office of Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND  58504-7736
Telephone (701) 328-5570
Facsimile (701) 328-5568
bmcard@nd.gov