# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NORTH DAKOTA

* * * * *

| | |
|---|---|
| In re:<br><br>Jack A. Glasser,<br><br>              Debtor. | Case No: BK-22-30244<br><br>Chapter 7 |
| State of North Dakota ex rel. Drew H. Wrigley, Attorney General,<br><br>              Plaintiff,<br><br>vs.<br><br>Jack A. Glasser,<br><br>              Defendant. | Adversary Proceeding No. |

## COMPLAINT OBJECTING TO DEBTOR'S DISCHARGE PURSUANT TO 11 U.S.C. § 523 AND TO DETERMINE DICHARGEABILITY OF UNLIQUIDATED DEBT

Pursuant to Fed.R.Bankr.P. 4007, 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(7), Plaintiff State of North Dakota on the relation of Drew H. Wrigley, Attorney General, by and through Assistant Attorney General Brian M. Card, Consumer Protection and Antitrust Division, brings this cause against Jack A. Glasser ("Debtor"), and upon information and belief alleges as follows:

## I. INTRODUCTION

1.      The State of North Dakota brings this action on the relation of Drew H. Wrigley, the Attorney General of the State of North Dakota, pursuant to Fed.R.Bankr.P. 4007, 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(7). This action seeks, pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(7), a determination that unliquidated debt and undetermined relief owed to the State

pursuant to N.D.C.C. ch. 51-15 is nondischargeable.

2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(7). This is a core proceeding under 28 U.S.C. § 157(b)(2)(J). Venue is proper in this district under 28 U.S.C. § 1409.

3.      This adversary proceeding relates to the Chapter 7 Case No. BK-22-30244 filed by Debtor Jack A. Glasser, in the United States Bankruptcy Court for the District of North Dakota.

4.      On May 3, 2022, the State of North Dakota ex rel. Drew H. Wrigley, Attorney General ("State"), pursuant to N.D.C.C. ch. 51-15, commenced a consumer protection enforcement against Debtor Jack A. Glasser ("Debtor"), his business Glasser Images, LLC ("Glasser Images"), his partner Jace Schacher ("Schacher"), and up to 100 John and Jane Does. *See State v. Glasser*, No. 08-2022-CV-00969 (Dist. Ct. S. Central Jud. Dist., N.D.) ("Enforcement Action").

5.      In summary, the State alleges that Debtor and his business violated N.D.C.C. ch. 51-15 by: (1) soliciting large advance payments to take and provide primarily wedding photography and videography services and then failed to provide the products, services, or a refund; (2) soliciting large advance payments from clients without disclosing that it was undercapitalized and had been undercapitalized for years before its closure; (3) soliciting large advance payments from clients without disclosing that Debtor and Schacher were spending Glasser Images' funds on themselves; (4) failing to provide the products and services they advertised and promised; and (5) failing to pay independent contractors for the photography or videography services they performed on behalf of Glasser Images. As of commencement of this adversary proceeding, the Enforcement Action is ongoing.

6.      As detailed below, Debtor incurred debts owed to clients and independent

2

contractors for whom North Dakota seeks restitution in State court by making false representations that he knew to be false with the intention and purpose of deception. *Matter of Van Horne*, 823 F.2d 1285, 1287 (8th Cir. 1987). Debtor's clients and independent contractors relied on Debtor's representations and sustained injury as a result of Debtor's representations. *Id.*

## II. PARTIES

7.     Drew H. Wrigley is the Attorney General of the State of North Dakota. Under N.D.C.C. § 54-12-03, the Attorney General "may make an investigation" in any county in North Dakota "to the end that the laws of the state shall be enforced therein and all violators thereof brought to trial …." N.D.C.C. § 54-12-03. The Consumer Protection and Antitrust Division ("the Division") of the Attorney General's Office is established by N.D.C.C. § 54-12-17 and requires the Division to enforce North Dakota's consumer fraud laws and to fully investigate suspected violations thereof. N.D.C.C. § 54-12-17. In a consumer protection action brought under N.D.C.C. ch. 51-15, the State may seek and obtain equitable relief including injunctive relief, restitution, attorney's fees and costs, and civil penalties. N.D.C.C. §§ 51-15-07, 51-15-10, and 51-15-11.

8.     Defendant Jack A. Glasser at all relevant times was the owner, officer, or principal of, directed, controlled, managed, participated in, or supervised the activities of, or in the course of his business, vocation, or occupation, engaged in the business and transactions of Glasser Images, LLC, including the acts and practices described herein.

## III. GENERAL ALLEGATIONS

**A.     Debtor and his business, Glasser Images, LLC.**

9.     On or about March 25, 2008, Debtor formed Glasser Images.

10.    Glasser Images operated until its closure on October 7, 2021.

11.    On its website, Glasser Images described itself as a "professional photographer[ ]

and videographer[ ] providing wedding photography, wedding video, commercial photography, commercial video, senior pictures, family portraits, newborn photography, and business headshots."

12.     For the sixteen years of its operation, Debtor was Glasser Images' owner and its sole member.

13.     Under oath and with counsel, Debtor testified that Glasser Images observed few corporate formalities:

     a.  Debtor (and Schacher) used Glasser Images' account to make personal expenditures.

     b.  Debtor did not make a contribution to Glasser Images when it was formed.

     c.  Glasser Images did not have or implement an operating agreement.

     d.  Glasser Images did not hold member meetings; instead Glasser Images kept what Debtor described as "annual minutes."

     e.  Glasser Images did not formally approve of its decisions.

     f.  Glasser Images did not make distributions to its members.

14.     Debtor testified that there was a "blurred line" between himself and his business saying that "[he] was the business, [and] the business was [him]."

15.     Furthermore, Glasser Images is insolvent and will be insolvent at the time judgment is entered in the State's consumer protection enforcement action.

16.     Under North Dakota law and consumer protection jurisprudence, Debtor is not entitled to the protections usually afforded by a limited liability company to its members.

**B.     Glasser Images made false representations to clients.**

17.     Glasser Images made four categories of false representations to its clients and potential clients: First, it falsely represented that it would provide products or services but then

failed to do so. Second, it falsely represented it would provide two photographers for client weddings but often only provided one. Third, it falsely represented it would provide highly skilled photographers, videographers, and editors, but often did not do so. And fourth, to induce clients to give it money, it issued inaccurate invoices, including "past due invoices" that were not past due.

        i.      *Glasser Images falsely represented it would provide products and services but did not do so.*

18.     Glasser Images advertised its services to consumers on its website formerly located at glasserimages.com; on social media, including on Facebook and Twitter; and on other websites, including at weddingwire.com and theknot.com.

19.     Though Glasser Images provided other types of services, wedding photography and videography was its primary business.

20.     Glasser Images' contracts with its clients contained the same basic terms: In exchange for monetary consideration, Glasser Images promised to provide photography and videography services and edited photographs and videos.

21.     Glasser Images required clients, including wedding clients, to pay it in advance. According to its contract with clients, the advance payment was a "non-refundable retainer [to be paid] on the date and equal to the amount" specified on the contract.

22.     Glasser Images' solicitations included widely distributed marketing and representations made by its client consultants of which Schacher was one.

23.     In 2019, 2020, and 2021, Glasser Images contracted with hundreds of clients to provide photography and videography services, including wedding photography and videography services.

24.     Pursuant to those contracts, Glasser Images solicited and accepted advance payments from hundreds of clients for services it would provide on a future date.

5

25.    Glasser Images deposited client advance payments into its general account. It did not deposit client advance payments into a separate account.

26.    Client advance payments to Glasser Images took different forms, including the full contract amount, a percentage of the total contract amount, or a down payment followed by monthly payments.

27.    Glasser Images induced some clients to pay the entire fee upfront in exchange for a discount.

28.    On October 7, 2021, Debtor announced the abrupt closure of Glasser Images. When Glasser Images communicated its closure to its clients, it stated it would not provide refunds.

29.    At the time of Glasser Images' closure, it had not provided photography and videography services and/or edited photographs or videos to hundreds of clients from whom it had solicited large advance payments months or years in advance.

30.    Glasser Images did not provide refunds to clients to whom it provided no services and for whom it had not completed performance.

31.    In sum, Debtor's business falsely represented to consumers that it would provide products and services in exchange for clients' payment but did not do so.

32.    Subsequent to Glasser Images' closure, delivery of edited or unedited photographs or video recordings have been effectuated by Glasser Images' former employees, Glasser Images' former independent contractors, via ShootProof's "Galleries for Good". None received compensation from Glasser Images for their efforts.

        ii.    *Glasser Images falsely represented it would provide two photographers to clients.*

33.    Even when Glasser Images ostensibly provided the products and services it promised, it did not always do so.

6

34.     Glasser Images routinely contracted to provide two photographers to photograph client weddings: a "primary shooter" and a "second shooter."

35.     Glasser Images advertised it provided two photographers to photograph client weddings.

36.     On its website, Glasser Images represented the following to clients and potential clients in a "Q&A":

**What happens if there's a snowstorm or my photographer has an emergency?**
In 15+ years we've been in the business, we've never missed a wedding! We have backup plans in place and will make sure we are absolutely there, come snowstorm or the stomach flu.

37.     Glasser Images also represented on its website:

**2 photographers** will be there to capture everything throughout the day. Having 2 photographers also provides tons of variety and ensures all of your moments are captured!

38.     Despite its multiple promises to provide two photographers, Glasser Images did not always do so.

39.     Debtor, on behalf of his business, admitted under oath and with counsel that Glasser Images did not always provide the promised second shooter and that, when Glasser Images failed to provide the second shooter, it had broken its promise to its client.

    *iii. Glasser Images falsely represented the quality of its photography to clients and potential clients.*

40.     Glasser Images advertised its services using the edited photographs of its most skilled photographers, those it internally rated "amazing." *Infra* ¶¶ 95, 98.

41.     As part of its sales pitch, Glasser Images represented to clients and potential clients that it trained all of its photographers and videographers.

42.     Contrary to its advertising, Glasser Images did not always provide "amazing"

photographers to clients, but it instead provided photographers who it rated as merely "good" or worse. *Infra* ¶¶ 95, 98.

43.     The majority of Glasser Images' photographers and editors were not the "amazing" photographers it used in its advertising.

44.     Instead, the majority of its photographers and editors (42) were not "amazing," but were "good," "need training and improvement," or "should be removed" after Glasser Images hired more photographers and editors.

45.     An even larger number (103) have no rating at all because the photographers were either new or had been retained before determining their level of skill. *Infra* ¶ 96.

46.     Contrary to the representations made during client consultations, Glasser Images did not train its photographers or videographers for skill or style.

47.     According to testimony provided by Schacher, Glasser Images "had nothing to do with" the skill of its photographers or videographers.

48.     Instead, photographers or videographers were purportedly "vetted" for the standard required of Glasser Images. But even this claim is not true. *Infra* ¶ 98.

> iv.     *Glasser Images sent inaccurate invoices to clients including "past due" invoices that were not actually past due.*

49.     As part of its business, Glasser Images issued invoices to clients representing an amount owed on or by a specific date.

50.     But its invoices were not always accurate.

51.     To generate income including for Debtor and Schacher's personal use, Glasser Images issued invoices to clients titled or identified as "past due invoice."

52.     Glasser Images issued "past due invoices" to clients whose payments were not actually past due, falsely representing to clients that he or she had missed a payment to the

8

business. *Infra* ¶¶ 100-05.

      **C.**    **Glasser Images knew its false representations were false at the time made.**

53.    For each of the categories of false representations that it made, *supra* ¶¶ 17-52,

Glasser Images knew the representations were false at the time it made them.

        i.    *Glasser Images knew that it could not provide the products and services it*
           *promised.*

54.    The failure of Debtor's business was the inevitable result of his mismanagement

and personal financial exploitation of Glasser Images.

55.    Since at least 2018, Glasser Images was undercapitalized, and Debtor was fully

aware of it.

56.    Between 2018 and 2021, Debtor obtained at least the following loans for Glasser

Images:

| Approx. Date | Source | Amount |
|---|---|---|
| 8/2017 | SBA Express Program | $350,000 business loan |
| Pre-11/2018 | PayPal | $100,000 business loan |
| Pre-11/2018 | First Community Credit Union | $310,000 business loan |
| Pre-11/2018 | Jeff Glasser | $12,600 personal loan |
| Pre-11/2018 | Joan Glasser | $14,600 personal loan |
| 11/2018 | First Western Bank | $500,000 business loan |
| 12/2018 | First Western Bank | $35,000 personal loan |
| 1/2019 | First Western | $65,140 business loan |
| 1/2019 | First Western | $300,000 business loan |
| 5/2019 | First Western | $100,000 personal loan |
| 6/2019 | First Western | $200,000 personal loan |
| 9/2019 | North Dakota Development Fund | $150,000 business loan |
| 1/2020 | Fora Financial | $150,000 business loan |
| Early 2020 | PayPal LoanBuilder | $125,000 business loan |
| 4/2020 | Small Business Administration Paycheck Protection Program | $245,000 business loan (Forgiven) |
| 5/2020 | Small Business Administration Economic Injury Disaster Loan | $150,000 business loan (Forgiven) |
| 9/2020 | First Western Bank | $1.2 million consolidation loan |
| 11/2020 | FinWise/Upstart | $34,132 |
| 2020 | Jeff Glaser | $8,000 personal loan |
| 2020 | Joan Glasser | $61,513.05 personal loan |

| Approx. Date | Source | Amount |
|---|---|---|
| 2020 | Joan Glasser | $9,078 personal loan |
| 2020 | Scott Russell | $50,000 personal loan |
| 2020 | David Borlaug | $50,000 personal loan |
| 1/2021 | Small Business Administration Paycheck Protection Program | $257,500 business loan |
| 6/2021 | Douglass Mahowald | $20,000 personal loan |
| 9/2021 | James Knudsen | $60,000 personal loan |

57.     In addition to the loans he actually obtained, Debtor applied for or requested loans from others, including friends, family members, financial institutions, and the government that were refused.

58.     Debtor frequently requested credit from Bravera Bank[1] ("Bravera"), where his personal and business accounts were located.

59.     Debtor also frequently requested credit from First Western Bank & Trust ("First Western") from whom he obtained loans totaling approximately $1.2 million dollars.

60.     Glasser Images' constant need for additional credit was not the only indication of its serious undercapitalization. On more than one occasion, Debtor communicated with his banks about Glasser Images' overdrawn account.

61.     In a January 4, 2019 e-mail, First Western advised Jack against taking on additional debt, particularly debt with high interest, saying, "if we just keep throwing debt at this you may not get your head above water in regards to cash flow."

62.     On January 10, 2019, Debtor told First Western that Glasser Images' checking account "dip[ped] negative today," and that Glasser Images was "just squeezing by but barely." Debtor disclosed to First Western that Glasser Images' "[a]ctual bank balance today is -$4500 due to some of last [sic] payroll's checks still clearing. If all cleared, we'd now be at -$10k."

---

[1] American Bank Center changed its name to Bravera on June 9, 2021.

63.     On January 11, 2019, Bravera advised Debtor that the Glasser Images checking account had been overdrawn for four days and, if the account was not credited sufficiently, the bank would begin refusing payment. Debtor was further advised that the bank had paid "39 items since the 4th quarter of 2018 through [January 11, 2019]. That is becoming too frequent."

64.     On June 6, 2019, Bravera told Debtor that Glasser Images' account "has been essentially negative for a week and $21k is far too large of an amount for [the bank] to carry. The items in question hit the account yesterday so they have to be returned this morning."

65.     On March 19, 2020, Debtor told First Western that Glasser Images was on the verge of failure, saying:

> We will not be able to make it for 60 days, let alone into next week. I need working capital ASAP. If not, I will need to shut down our apps needed for operations (our booking system for scheduling and invoicing, editing software, album design app, file storage, and so much more that require monthly payments), I will not be able to pay rent or equipment leases, we will need to stop advertising (which will cease the inquiries we have been getting), I will not be able to make payroll, we will not have people to fulfill weddings this summer, etc etc etc. SBA will take too long. Why can't we consolidate now? We have been talking about this for months. And now, more than ever, we need to consolidate and get additional capital to move forward. This is dire. I am not sure what I will do.

66.     On April 28, 2020, First Western explained to Debtor that Glasser Images did not qualify for the COVID-19 PACE Recovery Program because the business was unable to pay its debts prior to the COVID-19 pandemic: "I would agree that this could work but there is one big issue. The business was not spinning off enough cash to make its debt payments prior to this event. [Bank of North Dakota] requires that for this program." Later in the conversation, First Western told Jack that "[a]dding additional debt, regardless of the terms is not going to help the business cash flow as it is a struggle at best currently."

67.     On September 2, 2020, (more than one year before Debtor closed Glasser Images), Debtor requested additional credit from First Western for the Glasser Images, saying, "I know you

are taking the [$1.2 million] consolidation of just the First Western loans to the committee. But that will not do us any good. That will not be enough. We need the [$1.6 million]. The credit cards and PayPal are sucking all of the cash out of the business." He continued: "What's $400,000 when we already have [$1.2 million]," and said, "**Without it, we cannot survive.**"

68.     On September 4, 2020, during continued requests for credit from First Western, Debtor grew frustrated with the bank's denial of additional credit: "Does the bank not understand that we will not cash flow without additional cash? We will run out of cash. We will not be able to operate."

69.     In response, First Western advised Debtor that Glasser Images "should not need loan funds to cash flow," and that Glasser Images spent $500,000 in payroll and advertising to generate $200,000 additional revenue in 2019.

70.     On September 15, 2020, Debtor again requested credit from First Western acknowledging that Glasser Images was "just skirting by and barely keeping the checking account positive." Debtor asked First Western if it had "an immediate solution for [Glasser Images'] cash position," which he described as "not good."

71.     On September 25, 2020, First Western questioned Debtor's contradictory representations that Glasser Images had been severely impacted by the pandemic but that the business's revenue was up every month compared to the prior year: "How is the revenue up every month when comparing this year with last year considering the effects that you say the pandemic has caused."

72.     On November 9, 2020, a year before Debtor closed Glasser Images, Debtor's accountant told him that the business had too much debt and not enough cash flow, and, as a result, neither banks nor investors would assist him because he could not pay them back. Debtor's

accountant suggested that Debtor consult with a bankruptcy attorney.

73.     On June 29, 2021, Debtor contacted Bravera when Glasser Images' account was once more overdrawn because he wanted to know if declined transactions would clear if he made a deposit. In response, Bravera told him:

> We will not be re-running or honoring any checks until you get this account positive. This account has had 235 NSF items since it was opened, which is unacceptable. You have had 10 items in just the last month.
>
> I want to make this clear: the management of this account is unacceptable, and we will not honor checks if you have no funds. If this kind of account management continues we will be closing the account.

74.     Despite having been told by his accountant on November 9, 2020 to consult with a bankruptcy attorney due to Glasser Images' poor financial condition, Debtor waited until the Small Business Administration declined a $1.5 million loan modification (on October 4, 2021) to finally close Glasser Images.

75.     After consulting with a bankruptcy attorney in or around October of 2021, and making an initial payment of $1,000, Debtor waited until August 14, 2022 to file his petition.

76.     August 14, 2022 was the day before the State requested Debtor provide discovery in the Enforcement Action or it would seek judicial intervention.

77.     In summary, Glasser Images continued to take advance payment from clients in 2020 and 2021 knowing the entire time that it was on the brink of failure and that Glasser Images' failure meant it could not deliver the products and services it promised.

78.     Indeed, Debtor's balance sheets reflect Glasser Images' poor financial condition.

79.     As far back as October 15, 2018, Glasser Images' balance sheet reflected retained earnings of -$177,490.33.

80.     Negative retained earnings represent either a business's losses in excess of its

profits or a business's distributions to its owners in excess of its earnings. Negative retained earnings might also reflect a business who has made distributions to owners when the funds to do so were obtained from a creditor.

81.    By September 6, 2021, Glasser Images' retained earnings had ballooned to -$2,284.885.06.

82.    Assuming Glasser Images' negative retained earnings were only its losses in excess of its profits, Glasser Images' negative retained earnings indicated insolvency that Debtor disregarded to the detriment of his clients and creditors alike.

83.    But Glasser Images' retained earnings were not strictly its losses in excess of its profits. Glasser Images' retained earnings also included amounts moved by Debtor from its "loan to Jack" line item to retained earnings. *Infra* ¶ 148.

84.    Debtor as the owner and sole member of Glasser Images was fully aware of Glasser Images' financial condition and he was responsible for it.

85.    Debtor was also aware of his financial exploitation of Glasser Images and any alteration of Glasser Images' financial records to conceal it from creditors. *Infra* ¶¶ 152-77.

86.    Debtor knew that he was exploiting Glasser Images while it was undercapitalized.

    ii.    *Glasser Images knew it could not provide two photographers to every client it promised.*

87.    Glasser Images had more clients, year-over-year, since 2018.

88.    Despite its increased clientele, in October 2020, Glasser Images laid off approximately one-half of its staff.

89.    To accommodate the greater number of contracted clients, Glasser Images retained approximately 150 independent contractors to photograph and video record weddings, and to edit the raw photographs and videos.

14

90.     However, Glasser Images did not pay its independent contractors according to the agreed payment terms. Some it did not pay timely, and others it did not pay at all.

91.     As a result, Glasser Images was unable to retain the services of a sufficient number of photographers to provide both a primary and second shooter to each client it promised.

92.     Debtor as the owner and sole member of Glasser Images was fully aware of Glasser Images' inability to provide both a primary and second shooter to each client it promised.

> iii.   *Glasser Images knew it could not provide the quality of photography represented to clients and potential clients.*

93.     Despite advertising its services using the photography of its most skilled photographers and editors, (those it internally rated as "amazing)," Glasser Images knew it could not provide all of its clients with "amazing" photographers.

94.     Glasser Images maintained a spreadsheet of its photographers and editors with an assessment of their skill:

| Internal Rating | # of photographers/editors rated |
|---|---|
| Amazing | 20 |
| Good | 23 |
| Needs training and improvement | 15 |
| Should remove after more hires | 4 |
| New | 65 |
| Unsure | 38 |

95.     Glasser Images itself recognized that the majority of its photographers and editors (42) were not "amazing," but were "good," "need training and improvement," or "should be removed" after it hired more photographers and editors.

96.     An even larger number (103) have no rating at all because the photographers were either new or had been retained without determining their level of skill.

97.     According to former Glasser Images employees, the business frequently needed a

"warm body" to shoot client weddings, an effort made more difficult by Glasser Images' reputation that it did not pay photographers.

98.    A former employee of Glasser Images testified that its website misrepresented the quality of its photographers and that its client consultants gave "absolutely false" sales pitches to clients:

> **Former Employee**: Uh, just the, in the general practice of how you're matched with your photographers. [The client consultants] knew that that is not actually real. They knew that the quality of the photographers varied greatly between who they were going to get and who they got assigned. Who, what they thought they were seeing from the website was not what they were going to get. The photos that were portrayed on the website were by, you know, incredibly talented photographers that used to work there. Jack laid off almost all these people, and that was not how it was anymore at all.

99.    Debtor as the owner and sole member of Glasser Images was fully aware of Glasser Images' inability to provide the high quality of photography it represented in its advertising.

> iv.    *Glasser Images knew that it issued invoices to clients that were not accurate.*

100.    To generate income despite the circumstances outlined in this complaint, including the use of Glasser Images' funds by Debtor and Schacher for personal expenditures, Glasser Images issued inaccurate invoices to clients.

101.    For example, on October 2, 2021, Glasser Images issued a "past due invoice" to a client that was not past due.

102.    According to the invoice, Glasser Images' client had three prior amounts in full and the only amount owed was the payment due on October 6, 2021.

103.    In another example, on or about October 7, 2021, Glasser Images issued an invoice to a client for $4,230.00 for wedding photography and videography that was to take place on August 28, 2022.

16

104.   Glasser Images issued this invoice despite, first, knowing that it had been declined additional funding by the SBA on October 4, 2021 and that it could not survive without that funding; and second, closing that same date.

105.   Relatedly, Glasser accepted payment from other clients between October 4, 2021 and October 7, 2021 for services it knew that it did not and could not provide.

**D.   Glasser Images' representations were made with the intention of deceiving its clients.**

106.   "Intent may be inferred from a debtor's actions at the time of and subsequent to the loss." In re Stark, 408 B.R. 831, 837 (Bankr. D.N.D. 2009). "A court is to consider whether the circumstances, as viewed in the aggregate, present a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor." *Id.* (internal citations and quotations omitted); *also In re Johnson*, 584 B.R. 895, 906 (Bankr. D.N.D. 2018).

107.   Debtor's deceptive conduct includes the following: (1) using business funds for personal expenditures; (2) concealing his use of business funds for personal expenditures by manipulating his financial records (as well as directly representing otherwise); (3) providing false financial records to creditors; (4) providing false information to government agencies to obtain pandemic relief funds; (5) not paying independent contractors; (6) obtaining funds by falsely claiming he would imminently receive government funds; and (7) issuing inaccurate invoices to clients, *infra*.

108.   Additionally, Debtor failed to respond to credit card disputes filed by clients despite a court order that he do so thereby harming the creditor Messiahic (doing business as PayJunction).

*1.   Debtor intentionally deceived its clients because he and his partner used business funds for personal expenditures.*

109.   Debtor, as the owner and sole member of Glasser Images, intended his business to deceive its clients because Debtor and Schacher used Glasser Images to live an extravagant life

17

funded by the business.

110.    In particular, Debtor and Schacher used business funds to pay for: luxury vehicles, personal travel, fine dining, mortgage payments, personal care, and various miscellaneous expenditures. They also paid personal expenses after transferring funds to their personal account from Glasser Images' account.

a.    Luxury vehicles

111.    Debtor used business funds to pay for luxury vehicles.

112.    On March 17, 2021, approximately two months after receiving the second disbursement of $257,500 through the Paycheck Protection Program, Debtor entered into a 36-month lease for a 2021 Mercedes-Benz GLE450W4, costing the business $1,631.97 per month ($19,583.64 annually).

113.    A month later, on April 22, 2021, Debtor and Schacher entered into a lease for a 2021 Audi S5 Quattro that cost $2,059.35 per month ($24,712.20 annually).

114.    Though the Audi was ostensibly paid for using Debtor and Schacher's personal checking account, the payments were covered by funds transferred to their personal checking account from Glasser Images' account on at least three occasions in 2021.

115.    When questioned by the Division why he did not lease a less expensive vehicle, Debtor testified he "had had two Mercedes before," and then acknowledged "[he] maybe could have gotten a, a less expensive vehicle."

116.    In addition to the cars themselves, Debtor and Schacher used business funds to have their cars detailed as often as once a week.

b.    Personal travel

117.    Debtor used business funds to pay for personal travel.

18

118.    On November 15, 2018, Debtor contacted Bravera because he and Schacher were traveling to Hawaii: "[Schacher] and I will be traveling to Hawaii the end [sic] November. We leave 11/23 and fly back 12/1. Please put a note on the Glasser Images debit cards."

119.    Debtor requested that Bravera increase "the ATM limit, daily limit, and point-of-sale limit on his and [Schacher's] business debit cards."

120.    In another example, on or about May 28, 2021, Debtor and Schacher used Glasser Images' credit card to pay for a trip to Wyoming.

121.    Using business funds, Debtor and Schacher also traveled to Fargo, Minneapolis, and South Dakota for personal reasons on multiple occasions between 2018 and 2021.

122.    During the meeting of creditors, Debtor admitted the travel summarized above was personal travel.

c.    Fine Dining

123.    On a regular basis, Debtor and Schacher used the funds of Glasser Images to pay for meals and drinks at high-end restaurants.

124.    Debtor and Schacher's weekly meals cost the business hundreds of dollars per week.

125.    According to the Glasser Images' credit card statement, between May 15, 2020 and June 15, 2020, for example, Debtor and Schacher used business funds to pay for meals at Pirogue thirteen times (and Butterhorn four times).

126.    A year later, Debtor and Schacher continued their extravagant food and drink purchases. Between May 16, 2021 and June 15, 2021, for example, Debtor and Schacher used business funds to pay for food and alcohol at Pirogue, Butterhorn, Stage Stop Liquors, and Autumn Hills Liquors.

127.    On one occasion, Debtor and Schacher purchased a $400 meal for Debtor's birthday using business funds.

d.      Mortgage Payments

128.    Debtor and Schacher paid their mortgage by transferring business funds to their personal checking account to cover their mortgage payment of approximately $1,730.00 on at least nine occasions in 2020 and 2021.

e.      Personal Care

129.    Debtor and Schacher used business funds to pay for their frequent haircuts and hair care products.

130.    For example, Between May 15, 2020 and June 15, 2020, Debtor and Schacher spent $1,1991.10 for their haircuts and hair care products using business funds.

131.    A year later, between May 16, 2021 and June 15, 2021, Debtor and Schacher continued to use business funds to pay for their haircuts and hair care products.

132.    Even the pendency of Debtor's bankruptcy has not stopped him from making extravagant purchases.

133.    During the meeting of creditors, Schacher admitted that he and Debtor used some portion of $6,000 they obtained for personal care products.

f.      Miscellaneous Expenditures

134.    Debtor and Schacher used business funds to pay large amounts for plants. For example, between May 16, 2021 and June 15, 2021, Jack and Jace used business funds to purchase plants for themselves, spending at least $1,296.25.

135.    Debtor and Schacher used business funds to pay for a variety of frivolous subscription services for themselves, including for meal kits, smoothie kits, and alcohol kits.

g.    Bank Transfers

136.    Glasser Images paid for Debtor's subscription services when Debtor and Schacher transferred business funds into their personal account.

137.    Glasser Images subsidized other purchases and payments Debtor and Schacher made using their personal account.

138.    When they needed or wanted the additional funds for their extravagant lifestyle, or to cover necessary expenditures, Debtor and Schacher transferred funds from the Glasser Images account into their personal account.

139.    For example, on or about April 3, 2020, when Glasser Images' account was negative and Debtor's personal account was also negative, Debtor transferred business funds to his personal account to cover the negative balance.

140.    To the extent Debtor utilized business funds to pay for personal expenditures, *supra*, he did not report the funds he took from his business as income on his personal tax returns.

2.    *Debtor concealed his use of business funds to make personal expenditures from his banks by manipulating his financial records.*

141.    Debtor's use of Glasser Images' funds to live an extravagant lifestyle was concealed in at least two ways:

142.    First, his personal expenditures were wrongfully recorded as legitimate "meals and entertainment" purchases by the business.

143.    Second, his personal expenditures were categorized in accounting software as a "loan" purportedly given to Debtor by the business, though the business never approved the "loan," and it was not a loan at all.

144.    In reality, the "loan to Jack" was a running total of *some* of the personal expenditures made by Debtor and Schacher using the business's funds. Debtor acknowledged this

to his accountant when he asked: "Could I just do a loan to myself like I have been with any other personal expenses?"

145.    As of December 31, 2020, Glasser Images' "loan to Jack" totaled $499,111.02.

146.    This amount was so high that it accounted for a majority of Glasser Images' total assets. In its 2021 financial summary of Glasser Images, First Western wrote:

> A majority of [Glasser Images'] Total Assets comes from Loans to Shareholders with a reported amount of [$499,000]. This was an increase of [$163,000] from the previous year. Please note that this was a loan to Jack himself from the business.

147.    But even the $499,111.02 is inaccurate because, in addition to the "loan to Jack" accounting item, Glasser Images' balance sheets reflect large amounts corresponding to "retained earnings" and "owner draw."

148.    According to Debtor's accountant while under oath and with counsel, Debtor moved an amount or amounts from the "loan to Jack" line item to "retained earnings" on Glasser Images' balance sheets, thereby inaccurately reflecting his use of business funds for personal expenditures.

149.    On more than one occasion, including at the meeting of creditors, Debtor testified the loan given to him by his business was approximately $130,000.

150.    The figure of approximately $130,000 appears to come from a profit and loss document prepared by Debtor in November of 2021 that omits the "loan to Jack," negative retained earnings, and negative owner draw figures represented on Glasser Images' financial documents.

   3.    *Debtor provided false financial records to creditors and misrepresented his use of business funds for personal expenditures.*

151.    To obtain credit, Debtor misrepresented his Glasser Images' financial condition, including by providing falsified financial records to creditors and potential creditors.

a.    Debtor misrepresented his use of Glasser Images' funds.

152.    In late 2018, when Debtor first contacted First Western seeking a $500,000 loan, he had already incurred at least approximately $330,000 in personal expenditures against the business.

153.    In a credit presentation dated December 4, 2018, First Western wrote that "total assets decreased by [$330,000] due to a note from shareholder."

154.    About that change, on November 15, 2018, Debtor told First Western, "Per my CPA, the Note to Shareholder on the tax return is from adjustments (i.e. moving some expenses to personal, etc) and that I took out more money than what I had in equity."

155.    After blaming his accountant for his misuse of business funds, Debtor added: "Since fall 2017, I have not taken a single draw from the company other than to make 2017 tax payment." FWBT 695.

156.    But this was inaccurate, because Debtor and Schacher continued to use business funds to make personal expenditures.

157.    Indeed, *on the exact same date* that Debtor told First Western that he had not "taken a single draw from" Glasser Images, Debtor e-mailed Bravera and directed it to increase "the ATM limit, daily limit, and point-of-sale limit" and "put a note on the Glasser Images debit cards" due to a personal[2] trip he and Schacher were taking to Hawaii.

158.    Instead of taking an appropriate "draw," Debtor and Schacher directly spent Glasser Images' funds. In other words, Debtor and Schacher spent Glasser Images' funds without the intervening step of taking an appropriate draw from the business and Debtor concealed this from First Western.

---

[2] During the meeting of creditors, Debtor admitted this trip – and the other trips discussed in the State's consumer protection Complaint – was personal in nature.

159.    Debtor never told First Western, (who ultimately loaned him over $1 million), that he was using Glasser Images' funds to make personal expenditures despite other overtures regarding Glasser Images' expenses.

b.    Debtor provided false financial records to creditors.

160.    On or about October 15, 2018, Debtor provided First Western with a balance sheet reflecting inaccurate information as of October 15, 2020, including: owner draw totaling -$201,194 and retained earnings totaling -$177,490.33.

161.    The balance sheet omitted the approximately $330,000 "note to shareholder" reflected on Glasser Images' tax return. According to Debtor: "[T]he Note to Shareholder on the tax return is from some adjustments (i.e. moving some expenses to personal) and that I took out more money than I had in equity."

162.    At this approximate time, Debtor provided First Western with a document titled "Glasser Images Plan for 2018 Q4 and into 2019" where he identified five problems experienced by Glasser Images and his proposed solutions. Debtor omitted his and Schacher's use of business funds for personal expenditures.

163.    On or about September 29, 2019, Debtor provided First Western with a balance sheet reflecting inaccurate information as of August 31, 2019, including: "loan to Jack" totaling $59,627.70, owner draw totaling -$244,859.05, and retained earnings totaling -$387,391.34.

164.    On or about October 17, 2019, Debtor provided First Western with a balance sheet reflecting inaccurate information as of September 30, 2019, including: "loan to Jack" totaling $63,199.76, owner draw totaling -$244,859.05, and retained earnings totaling -$387,391.34.

165.    In or around March of 2020, Debtor requested 30-day extension of the maturity date of his various loans with First Western, and on or about March 10, 2020, Debtor provided

First Western with a Glasser Images balance sheet representing that the "loan to Jack" total was only $81,547.29, a figure that was not accurate.

166.    That same balance sheet represented that an owner draw of -$244,859.05 and retained earnings of -$1,159,623.70, figures that were not accurate.

167.    On or about May 21, 2020, Debtor provided First Western with a balance sheet reflecting inaccurate information as of May 18, 2020, including: "loan to Jack" totaling $89,487.64, owner draw totaling -$47,023.05, and retained earnings totaling -$1,406,257.38.

168.    On or about July 6, 2020, Debtor prepared a balance sheet as of December 31, 2019 that compared the years 2018 and 2019.

169.    The July 6, 2020 balance sheet represented that the "loan to Jack" totaled $75,584.93 as of December 31, 2019.

170.    The July 6, 2020 balance sheet represented that Glasser Images' owner draw totaled -$47,023.05 and retained earnings totaled -$625,498.21 as of December 31, 2019.

171.    On or about February 9, 2021, Debtor provided First Western with a balance sheet reflecting inaccurate information as of December 31, 2020, including: "loan to Jack" totaling -$79,313.31, owner draw totaling -$47,023.05, and retained earnings totaling -$1,446,569.42.

172.    On or about April 5, 2021, Debtor provided First Western with a balance sheet reflecting inaccurate information as of March 31, 2021, including: "loan to Jack" totaling -$29,326.83, owner draw totaling -$47,023.05, and retained earnings totaling -$2,284,939.42. FWBT 292-294.

173.    On or about May 26, 2021, Debtor provided First Western with a balance sheet that compared the years 2019 and 2020.

174.    The May 26, 2021 balance sheet represented that the "loan to Jack" totaled

25

$336,191 as of December 31, 2019, a figure far different than the amount ($75,584.93) represented on the July 6, 2020 balance sheet that Debtor provided to First Western.

175.    The May 26, 2021 balance sheet represented that the "loan to Jack" was actually $499,111.02 as of December 31, 2020, and that Glasser Images' retained earnings were -$1,068,595.54.

176.    The May 26, 2021 balance sheet omits the "owner draw" figure represented on other balance sheets prepared by Debtor and provided to First Western.

177.    On or about September 6, 2021, Debtor provided First Western with a balance sheet reflecting inaccurate information as of July 31, 2021, including: owner draw totaling -$47,023.05 and retained earnings totaling -$2,284,885.06. The September 6, 2021 balance sheet omits a "loan to Jack" amount.

> 4.    *Debtor provided false information to the Small Business Administration to obtain financial assistance for which he knew Glasser Images did not qualify.*

178.    Almost immediately after the first mitigating action was taken in North Dakota against the COVID-19 pandemic, Debtor used it as an excuse to seek funding.

179.    But Glasser Images was not struggling financially due to the pandemic, it suffered from a poor financial condition well before it.

180.    Debtor and his bankers repeatedly acknowledged the existence of Glasser Images' poor financial condition prior to the pandemic.

181.    In or around March of 2018, Debtor wrote that his business had "a cash flow problem." Debtor elaborated, writing that Glasser Images "needs a short-term cash injection ...," that it "need[s] to have some working capital [to] make sure we keep paying our people and covering operations," and "We also need a long-term cash flow solution."

182.    On January 3, 2019, Debtor requested additional credit from First Western and

acknowledged that his past efforts failed "to get [Glasser Images] out of this hole," and that he is "constantly playing catchup."

183.    On January 11, 2019, Bravera advised Debtor that the bank, due to nonsufficient funds, had paid "39 items since the 4th quarter of 2018 through [January 11, 2019]. That is becoming too frequent."

184.    On March 17, 2020, Debtor contacted First Western and requested assistance due to the pandemic and acknowledged that Glasser Images was not "in a good cash position to begin with."

185.    On March 18, 2020, Debtor contacted First Western again and elaborated on his need to consolidate his loans so that he could, among other things, (1) pay vendors, many of whom were over 90 days past due; and (2) pay off short-term loans taken before the pandemic. He also acknowledged that, with First Western's help, Glasser Images will be "where we need to be as we discussed prior to the COVID-19 crisis."

186.    In a March 23, 2020 e-mail, at a time when Glasser Images' account "dropped negative," Debtor requested assistance from Bravera claiming that Glasser Images had "felt the effect" of the pandemic which was "compounded with past cash flow needs."

187.    In an April 2, 2020 e-mail, Debtor specifically stated that he had applied for the Small Business Administration's Disaster Loan and acknowledged that the business's financial problems existed before the pandemic and for unrelated reasons: "As you know, we had cash flow issues before due to our growth and business model."

188.    In an e-mail dated April 28, 2020, Debtor contacted First Western regarding the Bank of North Dakota's COVID-19 PACE Recovery Program and his claimed need for the funds due to the COVID-19 pandemic.

189.    In response, First Western advised Debtor that the program was not available to Glasser Images because the business's problems existed before the pandemic: "I would agree that this could work but there is one big issue. The business was not spinning off enough cash to make its debt payments prior to this event. [Bank of North Dakota] requires that for this program."

190.    On August 5, 2020, Debtor made another request for credit from Bravera. He acknowledged that the business was "still running a loss," but that it was doing better than 2019.

191.    On September 25, 2020, First Western questioned Debtor's contradictory representations that Glasser Images had been severely impacted by the pandemic but that the business's revenue was up every month compared to the prior year: "How is the revenue up every month when comparing this year with last year considering the effects that you say the pandemic has caused."

192.    Debtor responded: "Weddings are up and carrying the increase but commercial isn't, hence the continued losses and cash flow issues. Remember how much of a loss we had last year [2019]. I can send reports again, if needed to help illustrate that."

193.    As summarized above, Debtor sought and obtained at least $2.2 million dollars before COVID-19 reached North Dakota.

194.    Likewise, Glasser Images' tax returns reflect significant losses before the pandemic: On its 2018 income tax returns, Glasser Images reported a $195,882 loss; and on its 2019 income tax returns, Glasser Images reported a $680,890 loss.

195.    To obtain the second loan through the Paycheck Protection Program, Debtor misrepresented its quarter-to-quarter losses.

196.    Aware that Glasser Images did not qualify for the second loan, on December 21, 2020, Debtor suggested manipulating Glasser Images' revenue so that he could qualify the

business to receive the funds: "We saw a decline in Q4, but I do not think it will be enough to amass a 25% decline from year to year unless we'd be able to break it out by category (ie commercial VS weddings)."

197.    In the same conversation, Debtor acknowledged that Glasser Images' losses had nothing to do with the pandemic but were due to "commercial revenue expansion in 2018 and 2019," and that Glasser Images "saw stable revenue (especially with weddings)" in 2020.

198.    Glasser Images' accountant, Sierra Hall, who had access to Glasser Images' financial records testified that Glasser Images did not have a qualifying reduction in revenue when comparing 2019 to 2020:

> ... I don't think year to year, like if we compared 2020 to 2019, I wanna say that 2020 wasn't down ... I feel like for some of the COVID grants or, um, programs or something, you had to have like a decease of this certain income, which I don't think we had, um, which was surprising.

199.    Ms. Hall also testified that Glasser Images' financial condition was apparent prior to COVID and that it was not paying subcontractors on time as a result.

200.    Despite these facts, on January 11, 2021, Debtor submitted the Paycheck Protection Program Second Draw Borrower Application Form representing at 38% reduction in revenue in the fourth quarter of 2020 ($379,001) compared to the fourth quarter of 2019 ($611,854).

> 5.    *Debtor did not pay independent contractors who performed work on behalf of Glasser Images.*

201.    Glasser Images contracted with independent contractors to provide its products or services to clients, including those who took photographs, recorded video, and/or edited photographs or videos.

202.    In exchange for taking photographs, recording video, and/or editing photographs or video, Glasser Images promised payment to its independent contractors.

203.    To induce independent contractors to perform work for Glasser Images despite the

business's failure to pay, Debtor strung independent contractors along, as one contractor describes

while under oath in the following exchange:

**AG:** Did you, did you talk to Jack about that first unpaid invoice or old invoice?

**Contractor:** Right. So the way it works is, um, with some in my contract, uh, we're on a 30-day pay scale. Um, so at the end of 30 days, usually he would send me a check and then that check would take a week or so to get to me since I'm in Georgia. So, I sent my invoice, maybe July 30th. So, I contacted him at the end of August and I was saying, hey where's my check. Um, and then, you know, the first week of September, he says, I don't know where it is. Must have got lost in the mail, let me resubmit it to you and then said, okay, I can, I can do that. Um, and then, uh, he said again, you know, a week later I expected it and he, he gave me the same story. So then at the end of September, I was actually shooting in Bismarck and I was like, Jack, I need this money, we talked about this. Uh, I'm in Bismarck right now, I can come into the studio, I can get the check. And he is like, how about we wait till Monday, and this is early October now. Uh, we'll wait till Monday, and, uh, Sierra, my accountant will come in and she'll PayPal you the money. And then Monday comes, he says he has a family emergency. And then, uh, he just says he can't do it. So, uh, he never paid me. So.

**AG:** So this conversation you just described that happened in October.

**Contractor:** Um, it happened throughout August, or I was checking up on the check in August, but mainly my concerns started in September. Um, uh that's when I started email him, emailing him frequently asking where my check was. And I also have, uh, screenshots of our email conversations and text conversations that I can send over to you.

**AG:** Okay. But the, you, you mentioned that you told him and that you were in Bismarck and that he could have his accountant get some, or write a check for you. When was that, that you were here and that you had that conversation with him?

**Contractor:** Um, let me make sure here. That was, uh, Friday, October 1st.

**AG:** Okay. So, so really that turned out to be just a few days before he closed the business?

**Contractor:** Right? Yes. But, um, you know, I was asking him, um, you know, he was telling me that he was resending the checks throughout September, but I, I don't think he actually did, because I've never had an issue of a check being lost before. So.

204.    In total, Glasser Images owes the independent contractor quoted above

approximately $26,000.

205.    Former employees were similarly deceived by Jack and Glasser Images:

**AG:** Okay. Um, so were there occasions where you, whether, I guess whether you're full-time or part-time, but while you were, say, doing a shoot that you were expecting to have a second shooter and you didn't have one?

**Former Employee:** Absolutely. Um, and, uh, the most recent, um, version of that, uh, was actually the last wedding I just shot, uh, the last week of September. Um, I wasn't assigned, uh, for this wedding at first. Um, it was in Great Falls, Minnesota, uh, over, I think the 25th, 26th, and, 27th. Um, originally I was attending a, uh, Rough Rider Tattoo Convention in Fargo, um, with my current place of employment. Um, but last minute, uh, week of, Jack contacted me and asked if I could shoot a wedding for him in Great Falls, Minnesota. Um, and I said, um, well, in that email, he had promised a bonus for shooting it. Um, a, and I said, uh, under two circumstances, I'll go shoot the wedding. Um, I want the bonus, and then, uh, I had booked a hotel for, um, my weekend in Fargo. Um, and I wanted him to reimburse me for that. Um, and he agreed to it. And so I went, shot the wedding in Great Falls, and then, of course, October 7th, or whatever happened, um, and I never saw that.

**AG:** So you never got the bonus you were promised?

**Former Employee:** Um, never got the bonus I was promised, I never got the reimbursement for the hotel. Um, I never got paid the, uh, hours that I worked for that weekend. Um, the whole thing.

206.    At the time of its closure, Glasser Images owed its independent contractors payment for the services they provided to Glasser Images.

207.    Debtor, on behalf of his business, testified that Glasser Images owed its independent contractors approximately $100,000 for unpaid wages.

> 6.    *Debtor obtained funds from creditors by falsely representing he would imminently receive government funds.*

208.    **Douglass Mahowald**. On or about June 4, 2021, Debtor contacted Douglass Mahowald and represented that he needed a "very short-term loan of $20,000 to $30,000 to bridge us until the EIDL funds come through."

209.    Mr. Mahowald asked Debtor if he expected to receive the EIDL funds by the end of June to which Debtor responded, "yes, we do expect to receive the EIDL before the end of the

month."

210.    On June 10, 2021, Debtor falsely told Mr. Mahowald that "[t]he EIDL has moved onto the next and final step. Might be another week or so before the funding hits our account."

211.    Based on Debtor's representations, in June of 2021, Mr. Mahowald provided Debtor with $20,000 by check.

212.    Throughout June and July, Debtor strung Mr. Mahowald along with assurances that he would repay the $20,000 loan as soon as various issues were sorted out with the SBA.

213.    On August 2, 2021, Debtor falsely represented to Mr. Mahowald that he "received the final docs and confirmation of funding from the SBA over the weekend and am awaiting timing for when those funds will actually hit the account."

214.    On September 1, 2021, after Mr. Mahowald asked Debtor the status of the loan repayment, Debtor falsely represented that he would be "getting a check in the mail."

215.    Debtor never repaid Mr. Mahowald because he never received the EIDL funds that he falsely claimed he was anticipating.

216.    To the contrary, the only loans Debtor had been granted by the SBA were given on August 25, 2017 (SBA Express Program), April 3, 2020 (Paycheck Protection Program), May 15, 2020 (Economic Injury Disaster Loan), and January 20, 2021 (Paycheck Protection Program Second Draw). Subsequently, Debtor was declined additional funding by the SBA. *Infra* ¶ 228.

217.    Despite these facts, Debtor attempted to convince Mr. Mahowald to loan him an additional $30,000 on or about September 28, 2021, just days before Debtor closed his business.

218.    **Bravera**. On August 2, 2021, Debtor attempted to obtain a "super short-term loan" from Bravera by falsely representing that he was expecting $350,000 from the SBA.

219.    In an e-mail to Bravera, Debtor wrote, "[W]e have $350,000 from the SBA that will

32

be hitting out [sic] business checking. Are you seeing anything on the back end?"

220.    After Debtor was told by Bravera that it did not see a deposit, Debtor wrote:

It's coming via ACH and they said timing for it hitting our account depends on the bank. How long do ACHs typically take? We had final approval on Saturday morning. I have been "3 to 16 calendar days." But most do see it between 3 and 5 calendar days (not business days). Also, being that we do have approval (and signed loan docs, approval letter, etc) and in case it does take longer, would American Bank Center be able to do a super short-term loan that the SBA funding pays off right away when it hits?

221.    Debtor's representations to Bravera were false and his business would not receive an additional $350,000 from the SBA in August of 2021 just as it did not receive additional SBA funding in June or July of 2021.

222.    **Jim Knudsen**. On or about September 22, 2021, Debtor contacted and then met with Jim Knudsen, the former owner of Modern Eyes, a Bismarck-based business.

223.    Debtor requested a 90-day short-term bridge loan for payroll expenses until he received what he referred to as a low interest SBA loan.

224.    According to Mr. Knudsen, he specifically asked and was assured by Debtor that an SBA loan had been distributed but that he (Debtor) was simply waiting to receive the check.

225.    Based on Debtor's representations to him, Mr. Knudsen agreed to provide Debtor with a $60,000 90-day loan. Mr. Knudsen provided Debtor with the funds by check.

226.    Debtor endorsed and deposited Mr. Knudsen's $60,000 check.

227.    Contrary to his representations to Mr. Knudsen, Debtor had not approved for an SBA loan, and he was not waiting to receive a check.

228.    Instead, on October 4, 2021, the SBA denied Debtor's loan modification request due to his inability to repay the loan.

229.    **Others**. Debtor attempted to obtain loans from other individuals under similar circumstances, including from longtime friend, McLauryn Alexander.

33

230.   On October 4, 2021, Debtor met with and asked Ms. Alexander if her parents would provide him with a loan.

231.   At the time he requested the loan through Mrs. Alexander, Debtor did not disclose to her that the SBA had just declined his $1.5 million loan modification request due to his inability to repay a loan.

7.   *Debtor and his business imposed their obligations to clients onto creditor PayJunction.*

232.   On December 4, 2017, to receive payment processing services for Glasser Images, Debtor entered into a Merchant Services Agreement with Messiahic, doing business as PayJunction. Debtor personally guaranteed all obligations of his business.

233.   After Debtor abruptly closed Glasser Images on October 7, 2022, many of Glasser Images' clients disputed earlier credit or debit card payments made to Glasser Images for merchandise they did not or would not receive.

234.   At the time he closed his business, Glasser Images had insufficient funds in its merchant account to cover client credit or debit card disputes.

235.   Debtor and his business then failed to respond to client credit or debit card disputes.

236.   As a result of Debtor's inaction, PayJunction became liable for the total amount disputed by Glasser Images' clients.

237.   On or about November 12, 2021, PayJunction sued Debtor and his business in the Middle District of Georgia seeking an "affirmative injunction requiring Glasser Images to timely and properly respond to each chargeback from Glasser Images' customers and cooperate with PayJunction regarding the ongoing and accruing chargeback liability."

238.   At the time PayJunction sued Debtor, PayJunction's liability exceeded $720,000.

239.   Subsequently, PayJunction sought and obtained a preliminary injunction requiring

34

Debtor and his business to, among other things, "respond to all chargebacks and retrievals when received from the cardholders' issuing bank or financial institution before the response date noted in each notice."

240.    Debtor failed to comply with the court's order requiring him to respond to disputes filed by his clients and, as a result, imposed his own liabilities to his business's clients on PayJunction.

241.    In other words, Debtor, through deliberate nonaction, imposed his financial obligations on PayJunction knowing that would be the result.

**E.    Glasser Images' clients reasonably relied on its representations.**

242.    Glasser Images' clients reasonably relied on the false representations summarized above, *supra* ¶¶ 17-52.

243.    Glasser Images' clients relied on its contractual promises because its contracts required reliance by prohibiting clients from retaining the services of another photographer.

244.    Glasser Images required its client to agree that it "shall be the exclusive photographer retained by Client for the purpose of photographing the wedding day," and "it is understood that [Glasser Images] is the exclusive official photographer retained to perform services outlined in [the] contract."

245.    Clients reasonably relied on Glasser Images' representations that it would provide two photographers to photograph their wedding.

246.    One client described the impact of Glasser Images failure to provide two photographers:

> **Client #1:** Yes. Um, we hired them and they were supposed to send two photographers to our wedding and we only received one photographer. They did not tell us until 10 minutes as I was walking into the church to put my dress on, that there would only be one photographer that day. So that was quite upsetting to figure

out, you know, 10 minutes before your first look with your groom, to find out that it wouldn't be captured the way you would imagine it to be captured. So that happened. And then the other problem, like day of the wedding, um, they did a whole questionnaire like a month before the wedding, about the order of events and what was happening, so that way they could follow it, and then the bride wouldn't have to think at all. And they also called me two weeks before the wedding and talked to me for a half hour to make sure all the family photos for who was in each photo was lined out, so I wouldn't have to think. None of that happened the day of the wedding so that she was constantly asking me, okay, who's in this photo, who's in this photo. So it was like, none of those events ever even occurred. I wasted a bunch of time detailing out all these photos I wanted and who was in the photos for no reason. So that was day of the wedding, I would say. [ ... ] So there's that, and then we were supposed to receive $300 product credit to the store, which we never got to be able to use before they shut down. They also had a freebie promotion for their 15th year anniversary of 15th free photos, which we also never got. And then after the wedding, it took 'em three days, I believe, before they finally reached out to us email form at 6:00 p.m., at night saying, we're sorry, we missed a photographer. Here's $300 of product credit, instead of here's a refund. So we called them, and tried to get actual money back. And they told us that the second photographer is not part of like, our payment that we're paying them, it's just a bonus. Even though their website states, they will always send two photographers, no matter of sickness, health, whether everything. So that was frustrating. That was the reason we picked them was they're a big company and that they would always have two available to send two a day and not miss out on that.

247.    When Client # 1 contacted Glaser Images about its failure to provide the promised second shooter, Glasser Images responded by falsely claiming the second shooter was merely a bonus: "Second photographers are built into all our packages and not billed as a separate service to you. This is built in as a nice extra for our couples and not as a portion of the package."

248.    In reality, the second photographer was advertised on its website and promised in its contracts. *Supra* ¶¶ 34-39.

249.    Clients reasonably on Glasser Images' representations that it would provide the high quality represented in its advertising.

250.    Client #1:

**Client #1:** And then we waited a month to receive our sneak peeks, which were terrible. They were all dark, we couldn't see our faces. And then we waited additional two, over two months after that to receive a full package. And again, all

the photos were just very dark, not what their online presence looked like. And, um, after the event, I realized that they only spent five minutes with my husband and I. So in the end we have all of three photos of the two of us, none of, none of 'em, we're both looking at the camera, and they're all the same exact pose. So we really have no photos of us, and all the photos of our family, our faces are dark.

251.    Another client, before contracting with Glasser Images, was promised a particular photographer, (one rated "amazing" by Glasser), only to be told later that the promised photographer was not available.

252.    In the promised photographer's place, Glasser Images scheduled a different photographer, one it rated "needs training and improvement."

253.    Client #2 said of the "needs training and improvement" photographer's gallery:

**Client #2:** Um, after looking through the pictures, the photo quality itself was terrible. Um, photo quality was the equivalent of giving a 10 year old, an iPad, and having them take pictures of your wedding. Uh, the color was terrible, the angles were terrible, um, there was no attention to detail in the pictures. Um, everyone like in the, the pictures, like I'm glad the couple got married. I, it looked like they had a grand time. It looked like they paid or gave, you know, a high hundred bucks to somebody's niece to go take pictures, or niece or nephew to go take pictures of their wedding, um, super budget style. Um, and that was not what I was going for, for that. Um, I guess, yeah, that lack of attention to detail, the lack of attention to color, um, the pictures looked really washed out to me. Um, some of them were grainy. Uh, a lot of them were out of focus and I think that was also a huge thing. Um, like if we're taking a picture of the bride and groom, why is it focused in on, you know, the caterer in the back, <laughing>, um, that kind of situation. And I just, I was not okay with that. And I thought it might have been like wedding nerves kind of thing, just stressing out. But I had some friends that were, uh, dabbled in photography on the side, or actually had photography businesses and were unable to do our wedding because they already booked. I had them look over those, uh, galleries as well, and they confirmed what I was seeing and they're like, yeah, no, this isn't, I, I, I see what you're talking about. I understand and I, I feel like you're justified at not wanting to pay that kind of money for that low quality.

254.    Unbeknownst to Client #2, Glasser Images contacted at least four different photographers, trying to find anyone it could, before scheduling the "needs training and improvement" photographer in place of the "amazing" photographer.

255.    According to former Glasser Images employees, the business frequently needed a

37

"warm body" to shoot client weddings, an effort made more difficult by Glasser Images' reputation that it did not pay photographers.

**F.    Glasser Images' clients sustained the alleged injury as a proximate result of the representations it made.**

256.    The financial injury sustained by Glasser Images' clients occurred as a proximate cause of Glasser Images' misrepresentations.

257.    As a result of Glasser Images' sudden closure, hundreds of its clients were impacted in at least four different ways:

   a.    Some clients who paid advance payments to Glasser Images received nothing, including a refund from Glasser Images.

   b.    Some clients who paid advance payments to Glasser Images, had photographs taken and video recorded, but did not or have not received from Glasser Images their photographs or video recording, whether edited or unedited, whether edited or unedited.

   c.    Some clients who paid advance payments to Glasser Images, had photographs taken and video recorded, but only received unedited photographs or video recording from Glasser Images' independent contractors, and not the promised edited photographs or video recording by Glasser Images.

   d.    Some clients who paid advance payments to Glasser Images and obtained their photographs or video recording (edited or unedited) only after paying their photographer or videographer (who Glasser Images did not pay), or another third party, effectively paying twice.

258.    Debtor may claim that refunds were given to certain clients who filed credit card disputes with their credit card companies.

259.    But those were not refunds. Instead, they were chargebacks: reversals of an electronic payment that prompted a dispute resolution process.

260.    As a result of Debtor's failure to respond to disputes, (in violation of a court order, no less), Debtor forced the debt he owes to his clients onto Messiahic, another creditor whose debt he seeks to discharge.

### IV. FIRST CLAIM FOR RELIEF
### GENERAL INJUNCTIVE RELIEF
### N.D.C.C. § 51-15-07

261.    The allegations made in all prior paragraphs are incorporated by reference as if fully set forth herein.

262.    In violation of N.D.C.C § 51-15-02, Debtor and his business (1) solicited large advance payments to take and provide (primarily) wedding photography and videography services and then failed to provide the products, services, or a refund; (2) solicited large advance payments from clients without disclosing that it was undercapitalized and had been undercapitalized for years before its closure; (3) solicited large advance payments from clients without disclosing that Debtor and Schacher were spending Glasser Images' funds on themselves; (4) failed to provide the products and services they advertised and promised; and (5) failed to pay independent contractors for the photography or videography services they performed on behalf of Glasser Images.

263.    By reason of the foregoing, and pursuant to N.D.C.C. § 51-15-07, the State is entitled to an order from a North Dakota District Court enjoining Debtor from continuing or engaging in unlawful practices or doing any act in furtherance of the unlawful practice.

264.    Injunctive relief is not a "claim" under 11 U.S.C. § 101(5) and is not dischargeable.

### V. SECOND CLAIM FOR RELIEF
### RESTITUTION TO CONSUMERS
### N.D.C.C. § 51-15-07

265.    The allegations made in all prior paragraphs are incorporated by reference as if fully

set forth herein.

266.    Debtor intended reliance when his business solicited advance payments from consumers.

267.    By reason of the foregoing, and pursuant to N.D.C.C. § 51-15-07, Debtor is liable to consumers for restitution for advance payments they received in violation of N.D.C.C. ch. 51-15.

268.    Debtor obtained consumer advance payments through false pretense, false representation, or actual fraud, including by: (1) soliciting large advance payments to take and provide (primarily) wedding photography and videography services and then failed to provide the products, services, or a refund; (2) soliciting large advance payments from clients without disclosing that it was undercapitalized and had been undercapitalized for years before its closure; (3) soliciting large advance payments from clients without disclosing that Debtor and Schacher were spending Glasser Images' funds on themselves; (4) failing to provide the products and services they advertised and promised; and (5) failing to pay independent contractors for the photography or videography services they performed on behalf of Glasser Images. As a result, debts owed to consumers for restitution are excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A) and/or 523(a)(7).

269.    Where the restitution order obtained by the State "furthers [its] important interests in rehabilitation and punishment rather than satisfying the victim's desire for compensation," consumer restitution is not dischargeable. *In re Anderson*, 2010 WL 1979277, at *3 (Bankr. D.N.D. May 17, 2010). This rule "applies even if the restitution order requires the [S]tate to forward all payments to the victim." *Id.*

40

## VI. THIRD CLAIM FOR RELIEF
### ATTORNEY'S FEES AND COSTS PAYABLE TO THE STATE
### N.D.C.C. § 51-15-10

270.    The allegations made in all prior paragraphs are incorporated by reference as if fully

set forth herein.

271.    Under N.D.C.C. § 54-12-17, the Division,

… shall act to enforce the consumer fraud laws and act with regard to the use or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, and shall make full investigation of such activities …

N.D.C.C. § 54-12-17.

272.    Accordingly, on May 3, 2022, the State commenced a consumer protection

enforcement action against Debtor and Schacher in *State v. Glasser*, No. 08-2022-CV-00969 (Dist.

Ct. S. Central Jud. Dist., N.D.). During the pendency of the State's consumer protection

enforcement action, Debtor filed his Voluntary Bankruptcy Petition.

273.    Under N.D.C.C. § 51-15-10, when the State commences an action pursuant to

N.D.C.C. ch. 51-15, a district court "shall award to the attorney general reasonable attorney's fees,

investigation fees, costs, and expenses of any investigation and action brought under this chapter

….". N.D.C.C. § 51-15-10.

274.    By reason of the foregoing, and pursuant to N.D.C.C. § 51-15-10, the State is

mandatorily entitled to its reasonable attorney's fees, investigation fees, and costs pursuant to its

investigation and prosecution of Defendants.

275.    Under 11 U.S.C. § 523(a)(7), unliquidated debt owed to the state for a fine, penalty,

or forfeiture payable to and for the benefit of the State is excepted from discharge. *In re Jenson*,

395 B.R. 472, 487 (Bankr. D. Colo. 2008) (mandatory award of fees in consumer protection action

41

suggests that they are penal in nature); *In re Klein*, 39 B.R. 927, 929–30 (Bankr. E.D. Pa. 1984)
(costs expended to secure a fine or penalty are "so closely related" to Section 523(a)(7) that they
are also nondischargeable).

## VII. FOURTH CLAIM FOR RELIEF
### CIVIL PENALTIES PAYABLE TO THE STATE
### N.D.C.C. § 51-15-11

276.    The allegations made in all prior paragraphs are incorporated by reference as if fully
set forth herein.

277.    Under N.D.C.C. § 51-15-11, the State is entitled to the imposition of a civil penalty
of not more than five thousand dollars for each of Debtor's violations of N.D.C.C. ch. 51-15.

278.    By reason of the foregoing, and pursuant to N.D.C.C. § 51-15-11, the State is
entitled to the imposition of a civil penalty of up to five thousand dollars for each violation of
N.D.C.C. ch. 51-15.

279.    Under 11 U.S.C. § 523(a)(7), unliquidated debt owed to the state for a fine, penalty,
or forfeiture payable to and for the benefit of the State is excepted from discharge. In re Milan,
546 B.R. 187, 192 (Bankr. D. Minn.), aff'd, 556 B.R. 922 (B.A.P. 8th Cir. 2016); Jensen, 395 B.R.
at 480-82.

## VIII. CLAIM TO DETERMINE DICHARGEABILITY OF UNLIQUIDATED DEBT

280.    The allegations made in all prior paragraphs are incorporated by reference as if fully
set forth herein.

281.    As a result of Debtor's filing bankruptcy during the pendency of the State's
consumer protection enforcement action, the State has unliquidated claims that will be determined
by a North Dakota District Court at a later date.

282.    Because the State has claims that may not be brought at a later date, the State seeks

a determination as to dischargeability as follows:

283.    As to the First Claim for Relief, the State seeks a determination that Debtor is not entitled to a discharge of injunctive relief that may be obtained by the State as injunctive relief is not a "claim."

284.    As to the Second Claim for Relief, the State seeks a determination that Debtor is not entitled to a discharge of debt incurred through false pretenses, false representation, or actual fraud under 11 U.S.C. §§ 523(a)(2)(A) and/or 523(a)(7)

285.    As to the Third Claim for Relief, the State seeks a determination that Debtor is not entitled to a discharge of debt owed to the State for attorney's fees, investigation fees, and costs as such debt, where mandatory, is excepted from discharge under 11 U.S.C. § 523(a)(7).

286.    As to the Fourth Claim for Relief, the State seeks a determination that Debtor is not entitled to a discharge of debt owed to the State for civil penalties as such debt is excepted from discharge under 11 U.S.C. § 523(a)(7).

287.    "The Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor.'" *Cohen v. de la Cruz*, 523 U.S. 213, 217, 118 S. Ct. 1212, 1216 (1998). "Section 523(a)(2)(A) continues the tradition, excepting from discharge any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud." *Id.* at 218 (*quoting* 11 U.S.C. § 523(a)(2)(A)) (internal quotations omitted). Debt arising from money obtained through fraud is not dischargeable, including attorney's fees and other relief.  *Id.* at 223. Accordingly, all unliquidated debt owed to the State is nondischargeable.

288.    As reflected above, Debtor is not the "honest but unfortunate debtor" the

bankruptcy code is designed to protect. The documents and testimony collected by the State reflect that Debtor defrauded nearly everyone, (save Schacher), all so that he and Schacher could continue to live an extravagant lifestyle paid for by his clients and any other person or entity who trusted him.

289.    On this basis, the Court should determine Debtor is not entitled to a discharge.

Dated this 14th day of November, 2022.

State of North Dakota
Drew H. Wrigley
Attorney General

BY:    /s/ Brian M. Card
Brian M. Card, ID No. 07917
Parrell D. Grossman, ID No. 04684
Assistant Attorneys General
Office of Attorney General
Consumer Protection & Antitrust Division
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Telephone (701) 328-5570
bmcard@nd.gov
pgrossman@nd.gov

Attorneys for Plaintiff.